ARLEEN D. JOUXSON-MEYERS    7223-0
ajouxson@physicianslawfirm.com
RAFAEL G. DEL CASTILLO    6909-0
rdelcastillo@physicianslawfirm.com
JOUXSON-MEYERS & DEL CASTILLO
A Limited Liability Law Company
302 California Ave., Suite 209
Wahiawa, Hawai`i 96786
Telephone: (808)621-8806; Fax: (808)422-8772

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 30 2007

at _2_ o'clock and _10_ min. _M_
SUE BEITIA, CLERK

Attorneys for Qui Tam Plaintiffs

## IN THE UNITED STATED DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D., STATE OF HAWAII, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D., and KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D. in their own behalf,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>HAWAI`I PACIFIC HEALTH; KAPI`OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; AND KAPI`OLANI MEDICAL SPECIALISTS<br><br>　　　　　Defendants. | CIVIL NO. CV 05-00521 JMS/LEK<br>(Federal and State - Qui Tam)<br><br>SECOND AMENDED COMPLAINT; EXHIBITS 1-4 |

## **SECOND AMENDED COMPLAINT**

Qui Tam Plaintiffs Kelley Woodruff, M.D., and Robert Wilkinson,

M.D., on behalf of the United States and the State of Hawai`i, and individually

(sometimes collectively referred to as "Plaintiff-Relators"), through their attorneys,

Jouxson-Meyers & del Castillo, hereby file their Second Amended Complaint

against Defendants HAWAI`I PACIFIC HEALTH ("HPH"), formerly known as

Kapi`olani Health, KAPI`OLANI MEDICAL CENTER FOR WOMEN AND

CHILDREN ("KMCWC"), and KAPI`OLANI MEDICAL SPECIALISTS

("KMS") (all parties complained against are sometimes collectively referred to as

"Defendants"), and allege as follows:

<u>SUMMARY OF THE SECOND AMENDED COMPLAINT</u>

      1.     This is an action for violations of the Federal False Claims Act,

31 U.S.C. §3729, et seq., and Hawaii Revised Statutes Chapter 661, Part II.

      2.     Plaintiff-Relators bring this action on behalf of the United

States and the State of Hawai`i to remedy Defendants' submission of false claims

to the Medicare, Medicaid and other programs in violation of the Federal False

Claims Act, 31 U.S.C. §3729-33, pursuant to the Qui Tam provisions of that Act

and the Hawaii False Claims Act, *inter alia* H.R.S. §661-2 1 et seq. (2000 Supp.),

pursuant to the Qui Tam provisions of that Act; and on their own behalf to remedy

Defendants' retaliatory actions against Plaintiff-Relators in violation of 31 U.SC.S.

3730(h).

3.      During the period from September 1997 through May 2001, Defendants participated with Medicare, the Hawai`i State Medicaid programs ("Med-QUEST") including QUEST providers who contract to cover health care benefits for beneficiaries eligible under Title XIX of the Social Security Act ("Act"), Saipan Medicaid, Guam Medicaid, Tricare (fka "Champus") and other government-funded health care programs for federal and state employees and their dependents, and participated with or submitted claims by arrangement with private health care benefit providers and insurers listed in **Exhibit 1**.  Fundamentally, participation in the foregoing programs, pursuant to an express contract of participation, is a prerequisite to receiving any payments for services to patients. Providers must certify that they do and will comply with the conditions of participation at all times before being extended a participation contract and accepted into a program as a provider-participant.  The continuing conditions of participation ensure that public funds are never paid for unnecessary costs, and that public monies are never paid for services inconsistent with sound fiscal, business, or medical practices, or for services that are not medically necessary or that fail to meet professionally recognized standards for health care, such that it is a federal felony for a provider to make any false statement or representation of a material fact with respect to the conditions or operation of its hospital facility in order to qualify for a contract of participation.  42 USCS § 1320a-7b(c)

4.      During the foregoing period, the health care benefit providers

listed in the foregoing paragraph, including the Medicaid programs and other

government-funded programs paid Defendants for facilities, supplies, equipment,

pharmacy, diagnostic and other non-professional technical components, allied

health professionals, or the administration of anesthetics based on Defendants'

submission of false claims and false certifications of compliance with Federal and

State laws and regulations and conditions of participation, as set forth hereinbelow.

5.      Plaintiff-Relators were privy to time, place, and nature of the

false claims and the documentation of that information for purposes of their filing

of this Second Amended Complaint.

6.      Provided herein for certain such claims Plaintiff-Relators

provide the patient-identifying number; relevant supporting information contained

in the patients' chart; claim reference numbers; description of the service, supply,

or facility charge; amount of charge; payor; amount paid; and date of payment.

## PARTIES

### PLAINTIFF-RELATORS

7.      Plaintiff Kelley Woodruff, M.D. is a resident of the State of

Hawai`i.  Plaintiff Woodruff is duly licensed to practice medicine in the State of

Hawai`i, and is board-certified in pediatric hematology oncology (cancer

specialist).  Plaintiff Woodruff brings this action on behalf of the United States of

America and the State of Hawai`i, and in her own behalf.

4

8.      Plaintiff Robert Wilkinson, M.D. is a resident of the State of Hawai`i.  Plaintiff Wilkinson is duly licensed to practice medicine in the State of Hawai`i, is board-certified in pediatric hematology oncology, and is the Principal Investigator for the Children's Oncology Group in Hawai`i.  Plaintiff Wilkinson brings this action on behalf of the United States of America and the State of Hawai`i, and in his own behalf.

<u>DEFENDANT KMCWC</u>

9.      On information and belief, Kapi`olani Medical Center for Women and Children ("KMCWC") is the only children's hospital in the State. KMCWC has the State's only pediatric in-patient ward and a pediatric cancer outpatient clinic which Drs. Wilkinson and Woodruff founded. KMCWC has a near 100 percent market share in the provision of hematology and oncology medical services to pediatric cancer patients.

10.     On information and belief, KMCWC is the Hawaii State designated neonatology center for tertiary care.

11.     On information and belief, KMCWC was held by Kapi`olani Health System prior to the merger on or around December 20, 2001 that created Hawai`i Pacific Health, and at all relevant times herein, Defendant KMCWC was for the purposes of this Complaint a "hospital" as defined at by the Act at 42 USCS § 1395x(e), and was a provider of inpatient and outpatient hospital services (42

C.F.R. § 433.56, Classes of health care services and providers defined), to
pediatric, including neonates, and adult patients who were eligible beneficiaries of
the Med-QUEST programs, Medicare patients, TRICARE pediatric and adult
patients, and adult and pediatric patients covered under other government-funded
health care programs for federal and state employees and their dependents, or by
private health care benefit providers and insurers.

DEFENDANT KMS

12.    On information and belief, Kapi`olani Medical Specialists
("KMS") is a Hawai`i nonprofit corporation Kapi`olani Health System created in
1995 to operate a group medical practice of specialty physicians, to market health
care to patients of Kapi`olani Health System hospitals, and to compete with private
physicians for patients. KMCWC provides the facilities and support services for
KMS physicians. Defendant KMS is a provider of physician services (42 C.F.R.
§ 433.56, Classes of health care services and providers defined).

13.    KMS employed Plaintiff-Relators during the relevant period
through 2001.

DEFENDANT HPH

14.    On information and belief, Defendant Hawai`i Pacific Health
("HPH"), the largest health care system in Hawai`i, is headquartered at 55
Merchant Street in Honolulu. Defendant HPH resulted from the merger of

6

Kapi`olani Health System (Oahu), Wilcox Health System (Kauai), and Straub

Clinic and Hospital (Oahu) on around December 20, 2001.  On information and

belief, the merger of the three health systems eliminated two major hospitals as

potential competitors of KMCWC.

      15.     Plaintiff-Relators are informed and believe, and upon such basis

allege, that Defendants KMCWC and KMS are wholly and/or partially owned

subsidiaries of a common parent corporation, Defendant HPH, and/or are operated

under a common scheme and/or merged and/or operated pursuant to common

policies, procedures, or practices and/or are governed by interlocking boards of

directors.

## JURISDICTION AND VENUE

      16.     This Court has jurisdiction of the claims presented herein,

pursuant to 28 U.S.C. § 1331 and/or 1337.

      17.     This Court has subject matter jurisdiction to hear the claims in

this Complaint pursuant to the Federal False Claims Act, 31 U.S.C. §3729-33, and

H.R.S. §603-2 1.5.  This Court has subject matter jurisdiction over the state claims

alleged herein pursuant to the principles of supplemental jurisdiction.

      18.     For the reasons set forth herein, the limitations period for the

false claims alleged has not expired because Defendants possessed a monopoly in

providing the services and facilities in question to the public and to Government

and private-funded health care benefit programs during the relevant period, making false claims more difficult to detect; and because standard practices observed in charting medical procedures were such that an auditor would not be alerted to the facts indicating that Defendants had submitted claims for invasive procedures requiring a physician's license or other special licensing and credentialing under Hawaii State law which the personnel who actually performed the procedures did not possess.

19.    When Plaintiff-Relators' inquiries exposed the key facts of the false claims, Defendants created an elaborate sham to prevent the appropriate Government investigators from discovering and covering up Defendants' false claims.

20.    This Court has personal jurisdiction over Defendants pursuant to H.R.S. §634- 35.

21.    Venue is proper and convenient in this District pursuant to 28 U.S.C. §1391, and H.R.S. §603-36.  Defendants were doing business in the State of Hawai`i at all relevant times herein, and Defendants committed the acts alleged in the State of Hawai`i.

## **SUBSTANTIVE ALLEGATIONS**

FIRST CLAIM FOR RELIEF
(VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS, *INTER ALIA*, 31 U.S.C. § 3729, ET SEQ. H.R.S. §661-21)

22.    Plaintiff-Relators reallege and incorporate herein by reference the allegations contained in Paragraphs 1 - 21 of the Second Amended Complaint and further allege as follows:

23.    This is a civil action Plaintiff-Relators bring on behalf of the United States under the Federal False Claims Act 31 U.S.C. §3729(a)(1),(2) and (3) and on behalf of the State of Hawaii and against Defendants under the Hawaii False Claims Act, *inter alia*, H.R.S. § 661-21(a)(1), (2) and (3), acting as a dutiful citizens regarding matters of public concern, and as the original source of the information upon which the allegations set forth herein are based.

24.    Plaintiff-Relators have direct and independent knowledge of the information on which the allegations herein are based, and voluntarily provided the information to the Government before filing this action based on the information.

25.    Defendants are jointly and severally liable for violations under *inter alia* 31 U.S.C. §3729, et seq. and H.R.S. §661-21, et seq. as follows:

**Hawaii State Title XIX Medical Assistance Program ("Med-QUEST")**

a.    The State of Hawaii has a State Plan for medical assistance which is qualified to receive substantial Federal public

monies through Federal Financial Participation pursuant to 42 U.S.C. §§ 1396a, et seq.

     b.     The Hawaii State Department of Human Services ("DHS"), Med-QUEST Division, is the designated State agency for administration of Hawai'i's Title XIX medical assistance program, which is designated "Med-QUEST" under the State Plan and in the DHS Regulations.

**Hawaii is Primary for Identification, Investigation, and Referral of Suspected Fraud and Abuse cases**

     c.     During the relevant period, Hawaii had established a State Medicaid Fraud Unit as defined at 42 U.S.C. §1396b.

     i.     The State Medicaid Fraud Unit was the lead agency in the case of the Kapi`olani Health Home Health Agency fraud which was settled for approximately $3.2 million in restitution, fines, penalties, and attorneys' fees and costs, including a relator's share, in mid-1999.

     ii.     Kapi`olani Health for and on behalf of its subsidiaries, including Defendant KMCWC, entered into a Corporate Integrity Agreement ("CIA") in August 1999 in which it obligated itself to report all instances of possible abuse or violations of federal or state laws, regulations, rules or

procedure to the DHHS Office of Inspector General and the State Medicaid Fraud Unit.

       iii.     Defendant HPH's former CEO, Roger Drue, who was its CEO at all relevant times herein, was the CEO of Kapi`olani Health when it entered into the CIA.

       iv.     Defendant KMCWC's former CEO, Frances A. Hallonquist, was its CEO when Kapi`olani Health entered into the CIA, and at all relevant times herein.

       d.     **Federal Financial Participation Restrictions**. Pursuant to Federal statutes and regulations, the Med-QUEST Division has only 60 days from discovery of an overpayment to a provider of Medicaid services to recover or attempt to recover the overpayment from the provider before the quarterly Federal Medicaid payment to Hawai`i is reduced by the amount of the Federal share of the overpayment irrespective of whether Hawai`i has obtained any recovery.  42 U.S.C. 1396b; 42 C.F.R. § 433.300.

       i.     "Overpayment" means the amount(s) Med-QUEST paid to a provider which is in excess of the amount that is allowable for services furnished under 42 U.S.C. 1396a.

ii.     Payments to providers are permitted for provider
practices are consistent with sound fiscal, business, or medical
practices, and result in only necessary costs to the Medicaid
program, or for services that are medically necessary meet
professionally recognized standards for health care. 42 U.S.C.
1396a; 42 C.F.R. PART 433, Subpart F (§§ 433.300, et seq.);
42 C.F.R. § 455.2.

iii.    Payments for claims which are the product of
abuse are overpayments for purposes of the statutory
requirement.  CMS defines "abuse" as improper behaviors or
billing practices including, but not limited to billing for a non-
covered service, misusing codes on claims inappropriately
allocating costs on a cost report.

**Claims and Services Defined**

e.     Hawaii State Med-QUEST defines "claim" for all
services covered by the Hawaii Medical Assistance Program as "a bill
for services rendered by a provider."

f.     **Prospective Payment System**.  Both Medicaid and
Medicare are designed by Federal statute to reimburse providers for
their costs of providing services to eligible beneficiary patients.  Both

Medicaid and Medicare set rates for various services which are based
upon historical costs obtained through periodic provider cost reports
of costs which are allowable and unallowable pursuant to the
regulations.  Rates are set prospectively, but excess costs reported in a
cost report may be reimbursed so that a prudent and efficient provider
sustains no loss on account of providing services to Medicaid and
Medicare beneficiaries.

      g.    The Hawai`i State Plan provides for two different
methods of providing services to qualified recipients, one of which
employs the prospective payment system, and one of which employs a
managed care model permitted under Title XIX.  Both methods of
providing services are subject to all Federal and State conditions of
participation and regulations ensuring that payments are made to
providers only for provider practices which are consistent with sound
fiscal, business, or medical practices, and result in only necessary
costs to the Medicaid program, or are only for services that are
medically necessary meet professionally recognized standards for
health care:

          i.    Med-QUEST's Fee for Service ("FFS") program,
accepts claims from providers through its fiscal intermediary

for interim cost reimbursement, and pays medical assistance payments directly to providers based upon the prospective rates which Med-QUEST has determined are sufficient to reimburse an efficient and prudent provider's cost of services provided to Medicaid-eligible recipients, and

    ii.    the QUEST program of managed care pays medical assistance payments directly to QUEST health plans which contract with the Med-QUEST Division to manage care for Medicaid beneficiaries assigned to the plans, and which plans accept claims from providers and pay them from the medical assistance funds collected from Med-QUEST in amounts which Med-QUEST has determined are necessary and sufficient to reimburse efficient and prudent provider costs for services to members of the QUEST plan.

    h.    The FFS program determines prospective payment rates for three general classes of facility, according to annual Medicaid discharge volumes and whether costs are also incurred for having an approved intern and resident teaching program in the facility.

    i.    Defendant KMCWC is in class III for purposes of the PPS.

i.    **Hospital services defined**.  Med-QUEST and Medicare reimburse hospital providers their costs for providing inpatient and outpatient services:

    i.    Federal law applicable to Med-QUEST defines inpatient hospital services bed and board, such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are ordinarily furnished by such hospital for the care and treatment of inpatients; and such other diagnostic or therapeutic items or services, furnished by the hospital or by others under arrangements with them made by the hospital, as are ordinarily furnished to inpatients.  42 U.S.C. § 1395x. Inpatient hospital services do not meet Federal requirements unless they are furnished under the direction of a physician, in a hospital which

    a.)    is licensed or formally approved as a hospital by an officially designated authority for State standard-setting, and

    b.)  meets the requirements for participation in Medicare as a hospital.  42 C.F.R. § 440.10.

   ii.  "Outpatient hospital services means preventive, diagnostic, therapeutic, rehabilitative, or palliative services that are furnished to outpatients. . .by or under the direction of a physician. . . by an institution that is licensed or formally approved as a hospital by an officially designated authority for State standard-setting, and meets the requirements for participation in Medicare as a hospital. . . ." 42 C.F.R. § 440.20.

  j.  Med-QUEST, through its fiscal intermediary, accepts periodic claims for interim reimbursements of provider costs on OMB-approved UB-92 forms.

   i.  UB-92 forms are required by Medicare and Med-QUEST for submission of claims for periodic interim reimbursement of costs in the FFS program.

   ii.  The UB-92 form, which has been in use since 1992, has 86 fields, generally purposed with identification, claims description and charges, and claims validating information.  The UB-92 data set is the creation of the National Uniform Billing Committee ("NUBC"), which was formed and

is supported by the Centers for Medicare/Medicaid Services

("CMS") to establish a data set that would collect the

information required to identify, itemize, and validate hospital

inpatient and outpatient claims.

      iii.    UB-92 form fields utilized for identification and

claims validation are required.

      iv.    The UB-92 data may be submitted electronically

pursuant to separate Electronic Provider Agreements requiring

that all electronically-transmitted claims comply with all State

and Federal procedures, rules, regulations or statutes

concerning the claimed services.

      k.    **Cost reports constitute claims**.  Med-QUEST and

Medicare require participating hospital providers to file periodic cost

reports of their historical costs of providing services from which Med-

QUEST and Medicare determine the PPS rates to pay each class of

facility in the next fiscal period, and may reimburse a provider for

allowable excess costs incurred during the cost report period.

      i.    Med-QUEST and Medicare require providers to

certify that they have reconciled the interim UB-92 data for the

periodic cost reports, and corrected any misreported or

unreported allowable and unallowable costs such that the cost report represents the provider's complete and accurate historical cost.

      ii.    Extensive Federal and State regulations govern every aspect of cost reporting by participating hospital providers to ensure that the PPS rates for each succeeding year are based only on allowable costs, and that no unallowable costs are included in rate computations which ultimately affect the amount of future payments which are made from public funds to the hospitals in the provider's class.

l.    **All Payments to hospital providers include a professional component.**  The Med-QUEST Division pays class III facilities from medical assistance funds:

      i.    a per diem all-inclusive rate for inpatient services according to the appropriate category of service (surgical, medical, or maternity services), with a special all-inclusive rate for NICU care if it is medically necessary for a neonate to remain in the hospital for more than six days following birth;

          a.)    the services of professional staff employed by hospitals, including but not limited to nurses, certified

nurse anesthetists, physical therapists, occupational

therapists, speech and language pathologists, physicists,

respiratory therapists, social workers, are included in the

PPS rate and not separately billable;

b.)    The all-inclusive inpatient PPS rates assume

the provider's personnel providing the various services

included in the all-inclusive rate are licensed as required

for participation in the program, and that they continue to

be licensed, and that the provider never substitutes

unlicensed care;

c.)    Under FFS, Med-QUEST also pays an

ancillary rate for the appropriate category of service per

discharge, including oncology services such as lumbar

punctures and bone marrow aspirations such as those in

issue in this matter, claimed by the provider in fields 42-

49 of the UB-92 form identified by the HCPCs (CPT)

code, description, date of service, and charge information

for the procedure(s).

d.)    Payments for ancillary rates assume the

provider's personnel performing the various ancillary

services are licensed as required for participation in the program, and that they continue to be licensed, and that the provider never substitutes unlicensed care.

e.)    Providers are further required to submit a periodic cost report aggregating all costs for which they were periodically reimbursed during the year on the basis of UB-92 claims.

ii.    Providers may also submit outpatient PPS claims to Med-QUEST on the UB-92 form for certain services provided by the hospital-employed professional staff, including but not limited to

a.)    lumbar punctures and bone marrow aspirations, which are claimed as part of a treatment room charge identified on the UB-92 form by the HCPCs (CPT) code, description, date of service, and charge information for the procedure(s), in fields 42-49 of the UB-92 form;

b.)    infusion of chemotherapeutic agents monitored by nurses are included in oncology services (also detailed in fields 42-49), and

c.)    aseptic dressing changes by nurses in

outpatient treatment rooms are included in the treatment

room service (also detailed in fields 42-49).

**Fraud and Abuse**

26.    **Compliance is a condition of participation.**    Participation

was a prerequisite to receive payments from medical assistance funds, and s a

condition of participation, Defendant KMCWC's pediatric oncology department

and its NICU were required to comply with all federal and state laws and

regulations, mandated by the Act and the Regulations interpreting the mandates

imposed.

a.    **False certification of compliance in participation**

**contract.**  Defendant KMCWC was required to certify compliance

with all federal and state laws and regulations as a prerequisite to

participation, in order for Med-QUEST, the QUEST plans, and

Medicare to accept their respective participation contracts from

Defendant KMCWC as a participating provider.

i.    As set forth herein, Defendant KMCWC assigned

unlicensed personnel to perform acts and duties in pediatric

oncology and the NICU in violation of Hawaii State licensing

laws, and thus was not in compliance with all federal and state

laws and regulations at the time it submitted contracts for participation for acceptance by Med-QUEST, the QUEST plans, and Medicare, constituting false certification.

      ii.    As set forth herein, Defendant KMCWC did not comply with all federal and state laws and regulations in providing services to patients in pediatric oncology and the NICU while it participated with Med-QUEST, the QUEST plans, and Medicare during the relevant period, constituting promissory fraud.

      b.    Med-QUEST regulations provide that the Director of the Department of Human Services or their designee may suspend or terminate a provider's participation in the Medicaid program if the provider fails to maintain or comply with its participation contract.

      i.    Generally, no costs are reimbursable to a non-participating provider;

      ii.    No costs are reimbursable to providers who do not meet the conditions of participation because such a provider may not participate in the Med-QUEST program.

      c.    Defendant KMCWC failed to meet the conditions of participation because it used nurses in its pediatric oncology

department and the neonatal intensive care unit ("NICU") to perform

procedures requiring a physician's license or a specially credentialed

valid nurse practitioner license.  As set forth hereinbelow, Defendant

KMCWC

      i.     employed at least three nurses who were not

properly licensed pursuant to Hawai`i State law during the

relevant period, and

      ii.    assigned them to perform certain acts and duties

which they did routinely perform on pediatric oncology and

neonatology patients, many of whom were Med-QUEST

beneficiaries.

      iii.   To the extent they might be treated as separate

entities for purposes of participation with Med-QUEST and the

false claims analysis, at least Defendant KMCWC's pediatric

oncology department and NICU failed to meet the conditions of

participation during the relevant period alleged, and were

therefore ineligible for participation and cost reimbursement.

      d.    **False certification of compliance in claims**. Defendant

KMCWC was required to certify periodically that it was in

compliance with all federal and state laws and regulations when it

provided the services to patient beneficiaries for which it submitted
claims for interim (UB-92) and periodic (cost report) cost
reimbursement.

        i.     Costs for inpatient and outpatient services
provided to Med-QUEST beneficiaries are reimbursable to
providers who meet the Medicare conditions of participation
and have an enforceable participation contract with the Med-
QUEST Division.  42 U.S.C. § 1396d; 42 C.F.R. § 482.1(a)(5),
including but not limited to certain requirements relevant to this
Complaint, such as

        a.)     42 C.F.R. §  482.1, requiring hospitals
providing inpatient and outpatient services to meet all of
the requirements of participation in Medicare, including
all of the requirements for participation at 42 C.F.R. §
440.10 to receive medical assistance payments,

        b.)     42 C.F.R. § 482.11, requiring, as a condition
of participation, assurance that all personnel are licensed
or meet other applicable standards that are required by
State or local laws,

c.)    42 C.F.R. § 482.23(b) requiring that hospital nursing personnel for whom licensure is required have valid and current licensure,

d.)    42 C.F.R. § 482.23(c) requiring all intravenous medications to be administered in accordance with applicable State law, and

e.)    42 C.F.R. § 482.54 requiring all outpatient services to meet standards of practice and be performed by appropriate professionals..

ii.    As a condition of payment, Med-QUEST requires providers to meet all applicable authorization and coding requirements for UB-92 forms, including using appropriate revenue codes and HCPCs codes.

iii.    Med-QUEST further requires that physicians and nurse practitioners who are Medicaid providers to submit claims independent of the hospital for services that they actually provided, and prohibits hospitals from submitting claims for such professional services on a UB-92 claim form. UB-92 claims for cost reimbursement of hospital services constitute allowable costs if a professional claim is submitted

for the service on a HCFA 1500 claim, as long as

documentation exists to prove that the professional initiated the

claim, thereby representing the professional's direct

involvement in the procedure which was the basis for the UB-

92 claim for cost reimbursement.

     iv.    Defendants submitted UB-92 claims for interim

cost reimbursement at the full PPS rate without disclosing to

the Med-QUEST division that unlicensed services had been

substituted for the professional services required by law and by

the conditions of participation, such that the UB-92 claims

submitted were indistinguishable from UB-92 claims

Defendants submitted which involved the services of a properly

licensed professional.

        a.)    Because Defendant KMCWC reported the

costs for unlicensed services as allowable when they

were unallowable as set forth herein, Defendant

KMCWC falsely certified that it was in compliance with

all federal and state laws and regulations at the time it

submitted

      (1.)   UB-92 claims for interim cost reimbursement of pediatric oncology inpatient ancillary services and outpatient services to Med-QUEST and Medicare,

      (2.)   UB-92 claims for interim cost reimbursement of the all-inclusive charges for NICU, and any ancillary services allowed for payment, and

      (3.)   submitted periodic cost reports to Med-QUEST and Medicare classifying the foregoing costs in pediatric oncology and NICU as allowable.

    b.)   As set forth herein, Defendant KMCWC was not in compliance with all federal and state laws and regulations at the time it submitted UB-92 claims to the QUEST plans for cost reimbursement, constituting false certification of claims for payment of medical assistance funds.

   v.   Under the narrowest possible construction of the conditions of participation and the False Claims Act, the claims

on UB-92 forms and the period cost reports for reimbursement

of any cost for inpatient or outpatient services connected with

an unlicensed act were false claims, if not all claims for cost

reimbursement associated with pediatric oncology and NICU

which were submitted during the relevant period, because

pediatric oncology and the NICU never complied with the

conditions of participation and therefore any costs were

unallowable.

e.    **Materially false representations in claims.**  For claims

validation, Med-QUEST requires providers to identify the licensed

attending physician in field 82 of the UB-92 claim, and to identify in

field 83 any other licensed physician or other licensed professional

who performed a procedure on which the claim for provider services

is based.

i.    Defendant KMCWC withheld the material fact that

the procedures complained of herein were performed by

unlicensed personnel each time it submitted claims for

reimbursement of costs for the services connected with the

unlicensed acts and for all-inclusive charges, and accepted

medical assistance payments thereon.

28

a.)    Defendants withheld the material fact that the procedures complained of herein were performed by unlicensed personnel each time it submitted a periodic cost report which included the costs claimed on the UB-92 claims for reimbursement of costs associated with the procedures performed by unlicensed nurses and for all-inclusive charges.

b.)    Defendants' use of HCPCs on the UB-92 forms associated with the claims for reimbursement of costs for unlicensed procedures falsely implied that the procedures for which it was seeking cost reimbursement were performed by a licensed professional or incident to the licensed professionals services when neither of the foregoing prerequisites for submitting UB-92 form claims with the HCPCs codes were met according to the nurse's own contemporaneous journal as set forth herein.

c.)    Defendant KMCWC's identification of an "attending physician" in field 82 of the UB-92 form for any claim for services connected with an unlicensed act falsely implied that the services for which Defendant

KMCWC was seeking cost reimbursement were performed by a licensed professional or incident to the licensed professionals services, when neither of the foregoing prerequisites for submitting UB-92 form claims with an attending physician's identifying information were met.

f.      The inclusion of the unallowable costs for unlicensed services in the cost reports increased the cost basis on which Med-QUEST's calculation of the PPS rates for Defendant KMCWC and all class III providers for each of the succeeding years in the relevant period and the subsequent years, thereby causing Med-QUEST to pay higher medical assistance cost reimbursements to class III providers than it was required to pay.

i.      The CMS Provider Manual states:

It is important to note, however, that if there is a suspicion of any intent to defraud the United States Government supported by even the initial insertion of a nonallowable item in the cost report, no warning is required prior to a prompt referral of the case for investigation and prosecution.

CMS Provider Manual, 2905.2 (Provider Payment Determinations and Appeals Procedures).

**Abuse**

g.      Defendant KMCWC's use of the unlicensed nurses to

perform procedures requiring a physician's license in the State of

Hawai`i or an advanced practice nurse practitioner's license with

special credentialing was inconsistent with sound fiscal, business, or

medical practices, and resulted in unnecessary costs to the Medicaid

program, or reimbursement for services that were not medically

necessary or that failed to meet professionally recognized standards

for health care and the specific Hawaii state licensing laws, and

Federal and State conditions for participation in Med-QUEST and

Medicare.

h.      Defendant KMCWC intentionally assigned the

unlicensed nurses to perform acts and duties requiring a physician's

license advanced practice nurse practitioner's license with special

credentialing, as alleged herein.

**Fraud**

i.      Defendant KMCWC knowingly misrepresented that all

of its personnel were properly licensed to perform their assigned

duties as required by Hawai`i State law to obtain a contract to

continue its participation with the Med-QUEST program as alleged

herein, with the attendant benefits and including medical assistance

payments, with the knowledge that Med-QUEST would be required

under Federal statutes and regulations to deny Defendant KMCWC

participation and medical assistance payments.

      j.     The foregoing improper billing practices constitute

abuses and the medical assistance payments Defendants received on

account of such abuses constitute overpayments for which Med-

QUEST is obligated to repay the Federal share, and which Med-

QUEST is thus entitled to recover from Defendants because

Defendants were never entitled to cost reimbursements for services

connected with unlicensed acts, or to overpayments on account of

unlicensed acts.

    27.    Defendants knew that the nurses were performing assigned

duties for which they were not licensed pursuant to Hawai`i State law when

Frances A. Hallonquist (CEO of KMCWC at all relevant times herein)

("Hallonquist"), signed a HAWAII STATE MEDICAID PROGRAM PROVIDER

AGREEMENT AND CONDITION OF PARTICIPATION on November 11,

1999, while Defendant KMCWC was subject to the CIA requiring it to make a full

confession of any possible violations of federal or state laws, regulations, rules or

procedures.  The November 11, 1999 participation contract was an updated version

of Defendants' Medicaid Provider Agreement effective July 1, 1992, which stated in relevant part, "We and each of us agree that all services for which our organization makes a claim against the Hawaii State Medicaid Program (Title XIX) shall be only for services rendered by persons who are properly licensed and/or qualified for the service they provide for which the claims are submitted."

       a.    Defendants obtained the medical assistance payments to which they were never entitled through deceit and misrepresentation by withholding material facts from Med-QUEST when CEO Hallonquist executed the November 1999 participation contract, and when Defendant subsequently submitted UB-92 claims for interim reimbursement of costs for unlicensed services, and periodic cost reports including unallowable costs for unlicensed services.

       b.    Med-QUEST regulations provide that the Director of the Department of Human Services or their designee may suspend or terminate a provider's participation in the Medicaid program if the provider fails to maintain or comply with its participation contract for falsification of the application for participation.

       c.    The Med-QUEST provider manual reprints the following provision of section 1128B of the Act (42 USCS § 1320a-7b(c)):

             Whoever knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement

or representation of a material fact with respect to the conditions or operation of any institution or facility <u>in order that such institution or facility may qualify (either upon initial certification or upon rectification) as a hospital</u>, skilled nursing facility, intermediate care facility, or home health agency (as those terms are employed in this title) shall be guilty of a felony and upon conviction thereof shall be imprisoned for not more than five years or subject to civil penalties, or both.

28.     Defendants certified their compliance each time they submitted the false claims which are the subject of this Second Amended Complaint.

29.     At all times relevant to this Second Amended Complaint, it was a violation of *inter alia*, 31 U.S.C. §3729(a)(1) and H.R.S. §661-21(a)(1) to submit, or cause to be submitted, a false or fraudulent claim for payments or approval by Medicare, Medicaid, Tri-CARE or other health care benefit programs funded by the State or Federal Government.

30.     At all times relevant to this Second Amended Complaint, it was a violation of *inter alia*, 31 U.S.C. §3729(a)(2) and H.R.S. §661-21(a)(2) to make, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by Medicare, Medicaid, Tri-CARE or other State or Federal programs.

31.     At all times relevant to this Second Amended Complaint, it was a violation of *inter alia*, 31 U.S.C. §3729(a)(3) and H.R.S. §661-21(a)(3) to conspire to defraud Medicare, Medicaid, Tri-CARE or other State or Federal program by causing a false or fraudulent claim to be allowed or paid.

32.      Defendant KMCWC employed registered nurses DF, RST, and
MZ, whom its administrators, Hallonquist and Rose Mary Bucher (Vice President
of Nursing) ("Bucher"), caused to be assigned to perform the following invasive
procedures on children:

     a.      DF performed the following procedures on pediatric and
neonatal hematology-oncology patients pursuant to her official
KMCWC job description entitled "Pediatric Oncology Nurse
Practitioner":

        i.      Lumbar Punctures: Current procedural
Terminology (CPT) code 62270;

        ii.      Bone Marrow Biopsies: CPT code 85102;

        iii.      Bone Marrow Aspirations: CPT code 85095,
which required special hospital credentials; and

        iv.      Chemotherapy injected into the Central Nervous
System: 96450, which also required special hospital credentials.

        v.      Conscious sedation

     b.      RST and MZ performed the following procedures on
newborn babies in the delivery room and premature infants and
distressed newborns in the hospital newborn delivery rooms and the
neonatal intensive care unit:

       i.       Clearing airway and ventilating, which can be complicated by upper airway obstruction/inadequate ventilation or gastric ventilation;

       ii.      Inserting laryngoscope and endotracheal tube which can be complicated by invasion of respiratory tract, risk of endobronchial and esophageal intubation, and trauma to local tissues and respiratory tract;

       iii.     intubating nasogastric for gastric distension; and

       iv.     complications of maternal sedation;

       v.      performing circumcisions with surgical instruments; and

       vi.     inserting percutaneous intravascular catheters (threading a catheter up a large vein or artery until the tip reaches large vessels inside the chest) in neonatal, pediatric, and adult emergency and inpatient departments.

33.     The above-listed procedures could only be performed by a licensed, properly credentialed physician, or a specially credentialed Advanced Practice Registered Nurse/Nurse Practitioner ("A.P.R.N.") licensed by the State of Hawai`i under Title 16, Chapter 89, Subchapter 14 of the Hawaii Administrative Rules ("HAR") §§ 16-89-75 through 97, et seq. ("Subchapter 14"), under authority

of HRS § 457-8.5 providing for A.P.R.N. licensing in Hawai`i.

        34.    The above-referenced job description for DF and the scope of her assignment was expressly reviewed by nursing administrators of Defendant KMCWC more than once, including a meeting held December 29, 1999 in which Bucher, Susan Young (DF's immediate supervisor), Henny Breen, and Joanne Marshall met with DF to consider her performance of the procedures in the operating room and specifically the requirement of credentialing for such procedures by the KMCWC medical staff.

        35.    Defendants were required to know of and comply with, and had actual and constructive knowledge of, HRS § 457-8.5 and the adoption of Subchapter 14.

        a.    As required under HRS § 457-8.5, Subchapter 14, which establishes the licensing requirement and the scope of practice for four areas of A.P.R.N. practice, was made effective September 5, 1997 after extensive hearings and comments by Defendants and other affected health care providers; and

        b.    Prior to being hired as Defendants' in-house General Counsel during the relevant period, Sharon On Leng, Esq. ("On Leng"), supervised over sixty attorneys and assistants for the Hawaii State Regulated Industries Complaints Office investigating

37

professional licensing violations.

36.    The performance of the invasive procedures listed above in paragraph 32 which Defendant KMCWC assigned to DF, RST, and MZ required special credentialing because none of the four A.P.R.N. practice specialties defined in the Subchapter 14 were expressly authorized to perform such invasive procedures.

37.    On information and belief, no nationally recognized credentialing organization or association certifies nurses or A.P.R.N.s to perform the procedures listed above in paragraph 32, and thus under Subchapter 14, no A.P.R.N. may legally perform such procedures without a specific credential issued by the hospital's medical staff.

38.    During the relevant period, DF was neither licensed nor qualified under applicable Hawaii State law to perform the invasive procedures listed above in paragraph 32.a  because:

        a.    DF never possessed an A.P.R.N. license during the relevant period; and

        b.    DF was not specially credentialed by the KMCWC medical staff or any recognized national credentialing association or organization at any time during the relevant period to perform the procedures listed above in paragraph 32.a.