39.    During the relevant period, Plaintiff-Relators knew that Defendants were submitting claims to health care benefit programs for for facilities, supplies, equipment, pharmacy, diagnostic and other technical components(hereinafter, "Technical Charges") and allied professional services because they regularly observed Defendant KMCWC's employed nurses completing billing slips and entering the information from the billing slips into Defendants' hospital computer system.

40.    During the relevant period, neither RST nor MZ was either licensed or qualified under applicable Hawaii State law to perform the invasive procedures listed above in paragraph 32.b because:

a.    Neither RST nor MZ possessed an A.P.R.N. license during the relevant period; and

b.    Neither RST nor MZ was specially credentialed by the KMCWC medical staff or any recognized national credentialing association or organization at any time during the relevant period to perform the procedures listed above in paragraph 32.b.

41.    At all times relevant herein, Defendants had actual and constructive knowledge of the licensure and qualifications of DF, RST, and MZ.

42.    As a condition of participation with Medicare and Medicaid and most other health care benefit programs in which Defendants participated,

Defendants were required to be accredited by a recognized and accepted

accrediting organization.

43.     Defendants maintained an accrediting relationship with the

Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") for

purposes of the foregoing condition of participation.

44.     At all times relevant herein, JCAHO required Defendants to

maintain job descriptions listing the specific qualifications, experience, and

training required to perform all health care service assigned roles.

45.     Defendants KMCWC's job description for DF, entitled

"PEDIATRIC ONCOLOGY NURSE PRACTITIONER," specifically assigned her

to perform the invasive procedures listed in paragraph 32.a., stating the following

under the heading "PRINCIPAL ACCOUNTABILITIES":

> 1.     Performs lumbar punctures on pediatric oncology patients and
> administers intrathecal chemotherapy as ordered by the Pediatric Oncologist.
> 2.     Performs bone marrow aspirations and biopsies for diagnostic
> purposes on pediatric hematology/oncology patients.
> 3.     Administers intravenous narcotics and analgesics as ordered by
> physician prior to intrusive procedures.

46.     Defendants failed to list the Hawaii State licensing

requirements set forth in Subchapter 14 in the foregoing PEDIATRIC

ONCOLOGY NURSE PRACTITIONER job description.

47.     JCAHO cited Defendant KMCWC on May 5, 2000 for its

failure to maintain job descriptions listing the required qualifications for DF, RST,

and MZ, and other allied health care professionals.

48.     The JCAHO citation required Defendant KMCWC to certify its compliance with the rule within 6 months of the citation as a condition of continuing accreditation.

49.     In sworn testimony on December 22, 2005, Hallonquist admitted that on or around November 23, 2000, she represented in her capacity as CEO of Defendant KMCWC that Defendant KMCWC had fully complied with the aforementioned job description rule when, in fact, Defendant KMCWC had not complied and had not made any changes in the duties assigned to DF, RST, or MZ.

50.     After Plaintiff-Relators' inquiries led outside auditors to the information that DF, RST, and MZ were not licensed or qualified under Hawaii State law, Defendants' chief medical director, Neal Winn, M.D. ("Winn") sent an e-mail dated June 6, 2001, to the medical directors of pediatric hematology-oncology and neonatology stating, "We have identified an urgent issue re supervision of nurse practitioners and compliance with Hawaii Revised Statutes. . ." subsequent to which Winn ordered the performance of invasive procedures eliminated from DF's, RST's, and MZ's assignments.  As set forth hereinbelow, Defendants thereafter instituted measures calculated to conceal from government and private plan investigators and auditors that they had received payments for the procedures DF, RST, and MZ performed while they were unlicensed and

unqualified under Hawaii State law.

PARTICULARS OF PEDIATRIC HEMATOLOGY-ONCOLOGY CLAIMS

51.    DF kept a personal record of the procedures she performed,
indicating, *inter alia*, the date of the procedure, procedure type, and patient name.
Plaintiff-Relators obtained DF's personal record, a true and correct copy of which
is attached as **Exhibit 2** to this Second Amended Complaint, with appropriate
redactions.  Plaintiff-Relators' Disclosure filed under seal was the original source
of **Exhibit 2**.  A true and correct copy of the portion of DF's sworn testimony
identifying the personal record is attached hereto as **Exhibit 3**.

52.    DF also kept the daily schedule of the procedures ordered for
pediatric hematology-oncology out-patients in which she wrote her own personal
notes indicating whether she performed a particular procedure, providing a
complete record of the unlicensed pediatric hematology-oncology procedures
performed during the relevant period.

53.    DF's records indicate she physically performed one or more of
the procedures, with or without conscious sedation, on a patient in 249 instances  at
KMCWC in the pediatric ambulatory unit ("PAU"), the inpatient cancer ward, one
of the operating rooms, or the operating room recovery area, on the following dates
within the relevant period:  9/18/1997, 9/30/1997, 10/13/1997, 10/14/1997,
10/15/1997, 10/28/1997, 11/4/1997, 11/7/1997, 11/10/1997, 11/11/1997,

11/14/1997, 11/18/1997, 11/25/1997, 11/26/1997, 12/1/1997, 12/2/1997,

12/3/1997, 12/5/1997, 12/8/1997, 12/15/1997, 12/22/1997, 12/23/1997,

12/26/1997, 1/27/1998, 1/28/1998, 2/4/1998, 2/11/1998, 2/20/1998, 2/24/1998,

3/2/1998, 3/3/1998, 3/6/1998, 3/10/1998, 3/17/1998, 3/18/1998, 3/23/1998,

3/24/1998, 3/25/1998, 3/26/1998, 4/2/1998, 4/3/1998, 4/9/1998, 4/14/1998,

4/28/1998, 5/1/1998, 5/5/1998, 5/12/1998, 5/19/1998, 5/27/1998, 5/29/1998,

6/15/1998, 6/18/1998, 6/26/1998, 7/14/1998, 7/16/1998, 7/17/1998, 7/20/1998,

8/6/1998, 8/7/1998, 8/17/1998, 8/20/1998, 8/24/1998, 8/31/1998, 9/2/1998,

9/4/1998, 9/21/1998, 10/1/1998, 10/12/1998, 10/16/1998, 10/19/1998, 10/30/1998,

11/3/1998, 11/9/1998, 11/10/1998, 11/11/1998, 11/12/1998, 11/13/1998,

11/18/1998, 11/25/1998, 12/4/1998, 12/7/1998, 12/11/1998, 12/16/1998,

12/28/1998, 1/6/1999, 1/8/1999, 1/26/1999, 1/27/1999, 2/5/1999, 2/11/1999,

2/17/1999, 2/19/1999, 3/24/1999, 3/25/1999, 3/30/1999, 4/2/1999, 4/8/1999,

4/14/1999, 4/26/1999, 4/27/1999, 4/28/1999, 5/4/1999, 5/25/1999, 5/28/1999,

6/15/1999, 6/16/1999, 6/29/1999, 7/9/1999, 7/13/1999, 7/15/1999, 7/16/1999,

7/19/1999, 7/20/1999, 7/21/1999, 8/2/1999, 8/3/1999, 8/4/1999, 8/10/1999,

9/8/1999, 9/10/1999, 9/17/1999, 9/21/1999, 9/23/1999, 10/6/1999, 10/27/1999,

10/29/1999, 11/3/1999, 11/4/1999, 11/10/1999, 11/24/1999, 11/30/1999,

12/13/1999, 12/22/1999, 12/23/1999, 1/7/2000, 1/19/2000, 1/21/2000, 1/23/2000,

1/24/2000, 1/25/2000, 2/7/2000, 2/22/2000, 2/23/2000, 2/28/2000, 2/29/2000,

3/6/2000, 3/13/2000, 3/15/2000, 3/21/2000, 3/23/2000, 4/4/2000, 4/19/2000,

4/25/2000, 5/3/2000, 5/10/2000, 5/11/2000, 6/1/2000, 6/6/2000, 6/26/2000,

6/29/2000, 7/12/2000, 7/13/2000, 7/17/2000, 7/31/2000, 9/26/2000, 10/3/2000,

10/5/2000, 10/9/2000, 10/17/2000, 10/19/2000, 11/7/2000, 11/17/2000,

11/21/2000, 11/22/2000, 11/30/2000, 12/1/2000, 12/5/2000, 12/6/2000, 12/8/2000,

12/14/2000, 12/21/2000, 12/28/2000, 1/5/2001, 1/9/2001, 1/11/2001, 1/31/2001,

2/1/2001, 2/5/2001, 2/8/2001, 2/12/2001, 2/23/2001, 2/27/2001, 3/16/2001,

4/23/2001, 5/2/2001, 5/3/2001, 5/9/2001.

54.     At all relevant times herein, Defendants had actual and

constructive knowledge that DF was performing the procedures because she

provided them with yearly summaries of the number and type of procedures she

performed as part of their annual evaluation of her performance.

55.     Defendants' actual knowledge that Defendant KMCWC's SMS

patient accounting system was programmed to submit claims for DF's services as

facility charges during the relevant period was confirmed in e-mail

communications between KMCWC administrators Judy Riesen, Pam Courtney,

Cynthia Hara, and Dew-Anne Langcaon dated March 23-24, 1998.

56.     During the relevant time period, Defendants purposefully

and/or knowingly and/or recklessly engaged in a pattern and practice of making

false claims to the Medicare/Medicaid programs, Tricare and other government-

funded health care programs for federal and state employees and their dependents,

and private health care benefit providers and insurers, and filing cost reports for

Technical Charges and for allied health professionals and the administration of

anesthetics, for each of the unlicensed procedures DF, RST, and MZ performed.

57.    In sworn testimony on March 3, 2006, Defendants' outside

legal counsel, Dennis Warren, Esq. ("Warren") admitted that "there was an

enormous amount of evidence indicating that [DF] had performed all or most of

the procedures. . . ." and that Warren had personal knowledge Defendants had,

during the relevant period, submitted claims and filed cost reports for Technical

Charges and allied personnel and the administration of anesthetics for such

unlicensed procedures performed by DF, RST, and MZ.

REPRESENTATIVE PEDIATRIC HEM-ONC FALSE CLAIMS

58.    Defendants submitted paper or electronic UB-92 form (CMS

form 1450) claims to the government and private health care benefit programs,

including the Hawaii State Medicaid Program and Hawaii QUEST contractors, for

one or more procedures DF allegedly performed in during the relevant period on

up to 150 pediatric hematology-oncology patients and a representative neonatology

patient, whose KMCWC-assigned medical record numbers are listed in **Exhibit 4**

attached to this Second Amended Complaint, including the following

representative patients and claims:

45

59.     For services and supplies allegedly provided to Patient DD, whose Medicaid identifying number was 000605377 and KMCWC-assigned medical record number 483304, Defendants submitted claims to the Hawaii State Medicaid Program listed below for total charges of

a.     $21,758.99 during the period from February 1, 1999 through July 3, 2000; and

b.     $8,545.96 during the period from August 16, 2000 through November 17, 2000.

60.     DF's record, attached as **Exhibit 2**, contains the following entries for lumbar punctures (with chemotherapy injected into the central nervous system) DF physically performed on patient DD while DD was sedated on February 17, 1999, April 14, 1999, June 16, 1999, October 6, 1999, November 24, 1999, January 19, 2000, and October 19, 2000:





61.    DF entered the following in the schedule for lumbar punctures (with chemotherapy injected into the central nervous system) DD physically performed on patient DD on October 19, 2000:

62.    Defendants submitted, or caused to be submitted, the following false or fraudulent claims for payment or approval by Medicaid for the procedures on patient DD listed above, primary diagnosis code 204.00 acute lymphoblastic leukemia, based upon which Medicaid paid Defendants as follows:

| Reference no. | # claims | Date of service | Date paid | Total pmt |
|---|---|---|---|---|
| 9082-1315-23-00 | 17 | Feb. 17, 1999 | July 23, 1999 | $90.43 |
| 9137-1324-28-00 | 17 | April 14, 1999 | July 30, 1999 | $102.80 |
| 9920-4000-05-88 | 20 | June 16, 1999 | Sep. 17, 1999 | $163.80 |
| 9920-4000-05-88 | 16 | Oct. 6, 1999 | Jan. 14, 2000 | $175.89 |
| 9328-1321-24-00 | 16 | Nov. 24, 1999 | Feb. 4, 2000 | $111.68 |
| 9357-1315-08-00 | 12 | Jan. 19, 2000 | April 7, 2000 | $113.07 |
| 10334-1309-10-00 | 11 | Oct. 19, 2000 | Dec. 22, 2000 | $140.58 |
| **Total claims** | **109** | **Patient #** | **000605377** | |

63.    The claims Defendants submitted on which the foregoing

47

payments were described as follows, in most cases with HCPCs codes which as

previously alleged, indicate that the service was performed by a licensed

professional, which it was not:

| Date/service | Service/other description | Associated code | QTY | CHARGE |
|---|---|---|---|---|
| 2/17/1999 | Medical-Surgical supplies | A4215 | 1 | 3.00 |
| 2/17/1999 | Medical-Surgical supplies | A4300 | 1 | 7.00 |
| 2/17/1999 | Medical-Surgical supplies | A4550 | 1 | 56.00 |
| 2/17/1999 | Medical-Surgical supplies | A4556 | 2 | 14.00 |
| 2/17/1999 | Medical-Surgical supplies | A4755 | 4 | 43.00 |
| 2/17/1999 | Oncology | 96450 | 1 | 162.00 |
| 2/17/1999 | Oncology | 96400 | 1 | 65.00 |
| 2/17/1999 | Laboratory | 82250 | 1 | 29.00 |
| 2/17/1999 | Laboratory | 82565 | 1 | 23.00 |
| 2/17/1999 | Laboratory | 82947 | 1 | 36.00 |
| 2/17/1999 | Laboratory | 84155 | 1 | 37.00 |
| 2/17/1999 | Laboratory | 84450 | 1 | 37.00 |
| 2/17/1999 | Laboratory | 84460 | 1 | 37.00 |
| 2/17/1999 | Laboratory | 85025 | 1 | 33.00 |
| 2/17/1999 | Laboratory | 89051 | 1 | 32.00 |
| 2/17/1999 | Pathology | 88107 | 1 | 55.00 |
| 2/17/1999 | Patient convenience | None identified | 1 | 7.24 |
| 4/14/1999 | Medical-Surgical supplies | A4215 | 1 | 3.00 |
| 4/14/1999 | Medical-Surgical supplies | A4300 | 1 | 7.00 |
| 4/14/1999 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 4/14/1999 | Laboratory | 82565 | 1 | 23.00 |
| 4/14/1999 | Laboratory | 36415 | 1 | 28.00 |
| 4/14/1999 | Laboratory | 82247 | 1 | 29.00 |
| 4/14/1999 | Laboratory | 89051 | 1 | 32.00 |
| 4/14/1999 | Laboratory | 85025 | 1 | 33.00 |
| 4/14/1999 | Laboratory | 82947 | 1 | 36.00 |
| 4/14/1999 | Laboratory | 84155 | 1 | 37.00 |
| 4/14/1999 | Laboratory | 84450 | 1 | 37.00 |
| 4/14/1999 | Laboratory | 84460 | 1 | 37.00 |
| 4/14/1999 | Pathology | 88107 | 1 | 55.00 |
| 4/14/1999 | Medical-Surgical supplies | A4550 | 1 | 56.00 |
| 4/14/1999 | Oncology | 96400 | 1 | 65.00 |

| | | | | |
|---|---|---|---|---|
| 4/14/1999 | Oncology | 96450 | 1 | 162.00 |
| 6/16/1999 | Medical-Surgical supplies | A4215 | 3 | 84.00 |
| 6/16/1999 | Medical-Surgical supplies | A4300 | 2 | 14.00 |
| 6/16/1999 | Medical-Surgical supplies | A4550 | 1 | 56.00 |
| 6/16/1999 | Medical-Surgical supplies | A4554 | 1 | 3.00 |
| 6/16/1999 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 6/16/1999 | Medical-Surgical supplies | A4755 | 4 | 43.00 |
| 6/16/1999 | Oncology | 96450 | 1 | 162.00 |
| 6/16/1999 | Oncology | 96400 | 1 | 65.00 |
| 6/16/1999 | Laboratory | 82247 | 1 | 29.00 |
| 6/16/1999 | Laboratory | 82565 | 1 | 23.00 |
| 6/16/1999 | Laboratory | 82947 | 1 | 36.00 |
| 6/16/1999 | Laboratory | 84155 | 1 | 37.00 |
| 6/16/1999 | Laboratory | 84450 | 1 | 37.00 |
| 6/16/1999 | Laboratory | 84460 | 1 | 37.00 |
| 6/16/1999 | Laboratory | 85025 | 1 | 33.00 |
| 6/16/1999 | Laboratory | 89051 | 1 | 32.00 |
| 6/16/1999 | Laboratory | 36415 | 1 | 28.00 |
| 6/16/1999 | Laboratory | 88107 | 1 | 55.00 |
| 6/16/1999 | Laboratory | 90780 | 1 | 110.00 |
| 6/16/1999 | Anesthesia | 96450 | 1 | 270.00 |
| 10/6/1999 | Medical-Surgical supplies | A4215 | 1 | 89.00 |
| 10/6/1999 | Medical-Surgical supplies | A4300 | 1 | 7.00 |
| 10/6/1999 | Medical-Surgical supplies | A4550 | 1 | 58.00 |
| 10/6/1999 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 10/6/1999 | Medical-Surgical supplies | A4755 | 4 | 44.00 |
| 10/6/1999 | Oncology | 96400 | 1 | 67.00 |
| 10/6/1999 | Oncology | 96450 | 1 | 167.00 |
| 10/6/1999 | Laboratory | 82247 | 1 | 30.00 |
| 10/6/1999 | Laboratory | 82565 | 1 | 24.00 |
| 10/6/1999 | Laboratory | 82947 | 1 | 37.00 |
| 10/6/1999 | Laboratory | 84155 | 1 | 38.00 |
| 10/6/1999 | Laboratory | 84450 | 1 | 38.00 |
| 10/6/1999 | Laboratory | 84460 | 1 | 38.00 |
| 10/6/1999 | Laboratory | 85025 | 1 | 34.00 |
| 10/6/1999 | Laboratory | 89051 | 1 | 33.00 |
| 10/6/1999 | Pathology | 88107 | 1 | 57.00 |
| 11/24/1999 | Medical-Surgical supplies | A4215 | 2 | 47.00 |
| 11/24/1999 | Medical-Surgical supplies | A4300 | 2 | 14.00 |

| 11/24/1999 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
|---|---|---|---|---|
| 11/24/1999 | Medical-Surgical supplies | A4755 | 4 | 33.00 |
| 11/24/1999 | Oncology | 96450 | 1 | 167.00 |
| 11/24/1999 | Oncology | 96400 | 1 | 67.00 |
| 11/24/1999 | Laboratory | 82247 | 1 | 30.00 |
| 11/24/1999 | Laboratory | 82565 | 1 | 24.00 |
| 11/24/1999 | Laboratory | 82947 | 1 | 37.00 |
| 11/24/1999 | Laboratory | 84155 | 1 | 38.00 |
| 11/24/1999 | Laboratory | 84450 | 1 | 38.00 |
| 11/24/1999 | Laboratory | 84460 | 1 | 38.00 |
| 11/24/1999 | Laboratory | 85025 | 1 | 34.00 |
| 11/24/1999 | Laboratory | 89051 | 1 | 33.00 |
| 11/24/1999 | Laboratory | 36415 | 1 | 29.00 |
| 11/24/1999 | Pathology | 88107 | 1 | 57.00 |
| 1/19/2000 | Medical-Surgical supplies | A4215 | 3 | 126.00 |
| 1/19/2000 | Medical-Surgical supplies | A4300 | 1 | 7.00 |
| 1/19/2000 | Medical-Surgical supplies | A4550 | 1 | 58.00 |
| 1/19/2000 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 1/19/2000 | Medical-Surgical supplies | A4755 | 3 | 29.00 |
| 1/19/2000 | Oncology | 96400 | 1 | 67.00 |
| 1/19/2000 | Oncology | 96450 | 1 | 167.00 |
| 1/19/2000 | Laboratory | 82947 | 1 | 37.00 |
| 1/19/2000 | Laboratory | 84155 | 1 | 38.00 |
| 1/19/2000 | Laboratory | 85025 | 1 | 34.00 |
| 1/19/2000 | Laboratory | 89051 | 1 | 33.00 |
| 1/19/2000 | Pathology | 88107 | 1 | 57.00 |
| 10/19/2000 | Sterile supply | A4215 | 1 | 3.00 |
| 10/19/2000 | Sterile supply | A4550 | 1 | 58.00 |
| 10/19/2000 | Sterile supply | A4556 | 1 | 3.00 |
| 10/19/2000 | Oncology | 96408 | 1 | 106.00 |
| 10/19/2000 | Oncology | 96410 | 1 | 167.00 |
| 10/19/2000 | Oncology | 96450 | 1 | 167.00 |
| 10/19/2000 | Laboratory | 82947 | 1 | 37.00 |
| 10/19/2000 | Laboratory | 84155 | 1 | 38.00 |
| 10/19/2000 | Laboratory | 85025 | 1 | 34.00 |
| 10/19/2000 | Laboratory | 89051 | 1 | 33.00 |
| 10/19/2000 | Pathology | 88107 | 1 | 57.00 |
| #000605377 | Total claim | CHARGES for 7 | visits | 5,308.24 |

64.     For services and supplies allegedly provided to Patient JHS, whose Medicaid identifying number was 000040648 and KMCWC-assigned medical record number 431965, Defendants submitted 71 claims to the Hawaii State Medicaid Program for total charges of $ 4,297.00 for the following:

65.     DF's record, attached as **Exhibit 2**, contains the following entries for lumbar punctures procedures DF physically performed on patient JHS on April 9, 1998, July 17, 1998, November 10, 1998, and February 19, 1999, and a lumbar puncture and bone marrow procedure DF physically performed on patient JHS on August 7, 1998:



66.     DF entered the following in the schedule for  lumbar punctures DF physically performed on patient JHS on November 17, 2000:



67.    Defendants submitted, or caused to be submitted, the following

false or fraudulent claims for payment or approval by Medicaid for the procedures

on patient JHS listed above, primary diagnosis code 204.00 acute lymphoblastic

leukemia, based upon which Medicaid paid Defendants as follows:

| Reference no. | # claims | Date of service | Date paid | Total pmt |
|---|---|---|---|---|
| 8170-1313-22-00 | 13 | April 9, 1998 | Dec. 4, 1998 | $283.74 |
| 8296-1314-21-00 | 13 | July 17, 1998 | Feb. 12, 1999 | $283.74 |
| 8296-1314-19-00 | 11 | Aug. 7, 1998 | Dec. 4, 1998 | $353.82 |
| 9015-6794-30-00 | 9 | Nov. 10, 1998 | Apr. 16, 1999 | $95.96 |
| 9082-1315-11-00 | 12 | Feb. 19, 1999 | July 9, 1999 | $620.97 |
| 0363-6755-24-00 | 13 | Nov. 17, 2000 | Jan. 26, 2001 | $205.42 |
| **Total claims** | **71** | **Patient #** | **000040648** | |

68.    The claims Defendants submitted on which the foregoing

payments were described as follows, in most cases with HCPCs codes which as

previously alleged, indicate that the service was performed by a licensed

professional, which it was not:

| Date/service | Service/other description | Associated code | QTY | CHARGE |
|---|---|---|---|---|
| 4/9/1998 | Medical-Surgical supplies | 99070 | 1 | 22.00 |
| 4/9/1998 | Medical-Surgical supplies | A4550 | 1 | 53.00 |
| 4/9/1998 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 4/9/1998 | Medical-Surgical supplies | A4755 | 1 | 5.00 |
| 4/9/1998 | Medical-Surgical supplies | A4755 | 1 | 25.00 |
| 4/9/1998 | Oncology | None identified | 1 | 97.00 |
| 4/9/1998 | Oncology | None identified | 1 | 153.00 |
| 4/9/1998 | Oncology | None identified | 1 | 153.00 |
| 4/9/1998 | Laboratory | 80049 | 1 | 69.00 |
| 4/9/1998 | Laboratory | 85023 | 1 | 31.00 |
| 4/9/1998 | Laboratory | 89051 | 1 | 30.00 |
| 4/9/1998 | Pathology | 88107 | 1 | 52.00 |
| 4/9/1998 | Anesthesia | | 1 | 247.00 |
| 7/17/1998 | Medical-Surgical supplies | 99070 | 3 | 37.00 |
| 7/17/1998 | Medical-Surgical supplies | A4213 | 1 | 3.00 |
| 7/17/1998 | Medical-Surgical supplies | A4550 | 1 | 56.00 |
| 7/17/1998 | Medical-Surgical supplies | A6402 | 1 | 62.00 |
| 7/17/1998 | Medical-Surgical supplies | A4755 | 20 | 80.00 |
| 7/17/1998 | Medical-Surgical supplies | A4755 | 3 | 38.00 |
| 7/17/1998 | Oncology | 96450 | 1 | 162.00 |
| 7/17/1998 | Laboratory | 82947 | 1 | 36.00 |
| 7/17/1998 | Laboratory | 84155 | 1 | 37.00 |
| 7/17/1998 | Laboratory | 85025 | 1 | 33.00 |
| 7/17/1998 | Laboratory | 89051 | 1 | 32.00 |
| 7/17/1998 | Pathology | 88107 | 1 | 55.00 |
| 7/17/1998 | Anesthesia | None identified | 1 | 749.00 |
| 8/7/1998 | Medical-Surgical supplies | 99070 | 3 | 37.00 |
| 8/7/1998 | Medical-Surgical supplies | A4550 | 1 | 56.00 |
| 8/7/1998 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 8/7/1998 | Medical-Surgical supplies | A4755 | 4 | 43.00 |
| 8/7/1998 | Oncology | None identified | 1 | 162.00 |
| 8/7/1998 | Laboratory | 82947 | 1 | 36.00 |
| 8/7/1998 | Laboratory | 84155 | 1 | 37.00 |
| 8/7/1998 | Laboratory | 85025 | 1 | 33.00 |
| 8/7/1998 | Laboratory | 89051 | 1 | 32.00 |
| 8/7/1998 | Pathology | 88107 | 1 | 55.00 |
| 8/7/1998 | Anesthesia | None identified | 1 | 103.00 |

| 11/10/1998 | Medical-Surgical supplies | 99070 | 1 | 23.00 |
|---|---|---|---|---|
| 11/10/1998 | Medical-Surgical supplies | A6402 | 2 | 38.00 |
| 11/10/1998 | Medical-Surgical supplies | A4755 | 31 | 137.00 |
| 11/10/1998 | Laboratory | 80054 | 1 | 73.00 |
| 11/10/1998 | Laboratory | 82150 | 1 | 45.00 |
| 11/10/1998 | Laboratory | 85025 | 1 | 33.00 |
| 11/10/1998 | Laboratory | 85025 | 1 | 33.00 |
| 11/10/1998 | Laboratory | 85025 | 1 | 33.00 |
| 11/10/1998 | Treatment Room | 90780 | 1 | 110.00 |
| 2/19/1999 | Medical-Surgical supplies | A4213 | 1 | 23.00 |
| 2/19/1999 | Medical-Surgical supplies | A4550 | 1 | 38.00 |
| 2/19/1999 | Medical-Surgical supplies | A4556 | 1 | 3.00 |
| 2/19/1999 | Medical-Surgical supplies | A4755 | 3 | 56.00 |
| 2/19/1999 | Oncology | 96450 | 1 | 7.00 |
| 2/19/1999 | Laboratory | 82947 | 1 | 38.00 |
| 2/19/1999 | Laboratory | 84155 | 1 | 162.00 |
| 2/19/1999 | Laboratory | 85025 | 1 | 36.00 |
| 2/19/1999 | Laboratory | 85025 | 1 | 37.00 |
| 2/19/1999 | Laboratory | 89051 | 1 | 33.00 |
| 2/19/1999 | Pathology | 88107 | 1 | 33.00 |
| 2/19/1999 | Anesthesiology | None identified | 1 | 32.00 |
| 11/17/2000 | Sterile supply | A4300 | 1 | 23.00 |
| 11/17/2000 | Sterile supply | A4550 | 1 | 38.00 |
| 11/17/2000 | Sterile supply | A4556 | 1 | 3.00 |
| 11/17/2000 | Sterile supply | A4755 | 1 | 7.00 |
| 11/17/2000 | Laboratory | 36415 | 1 | 58.00 |
| 11/17/2000 | Laboratory | 82947 | 1 | 7.00 |
| 11/17/2000 | Laboratory | 84155 | 1 | 7.00 |
| 11/17/2000 | Laboratory | 85025 | 1 | 29.00 |
| 11/17/2000 | Laboratory | 89051 | 1 | 37.00 |
| 11/17/2000 | Pathology | 88107 | 1 | 38.00 |
| 11/17/2000 | Anesthesia | | 1 | 34.00 |
| 11/17/2000 | Oncology | 62270 | 1 | 33.00 |
| 11/17/2000 | Oncology | 90780 | 1 | 57.00 |
| #000040648 | Total claim | CHARGES for 6 | visits | 4,297.00 |

69.    For services and supplies allegedly provided to Patient KM,

whose Medicaid identifying number was 0000658703 and KMCWC-assigned

54

medical record number 520120, Defendants submitted 28 claims to the Hawaii

State Medicaid Program for total charges of $ 1,653.00 for the following:

70.    DF entered the following in the schedule for lumbar punctures

DF physically performed on patient KM on October 4, 2000, primary diagnosis

code 204.00 acute lymphoblastic leukemia, and February 7, 2001, primary

diagnosis code 204.01 acute lymphoblastic leukemia in remission:



71.    Defendants submitted, or caused to be submitted, the following

false or fraudulent claims for payment or approval by Medicaid for the procedures

on patient KM listed above based upon which Medicaid paid Defendants as

follows:

| Reference no. | # claims | Date of service | Date paid | Total pmt |
|---|---|---|---|---|
| 0293-1315-02-00 | 15 | Oct. 4, 2000 | Nov. 10, 2000 | $630.02 |
| 1123-1316-17-00 | 13 | Feb. 7, 2001 | June 8, 2001 | $121.02 |
| **Total claims** | **28** | **Patient #** | **0000658703** | |

72.    The claims Defendants submitted on which the foregoing

payments were described as follows, in most cases with HCPCs codes which as

previously alleged, indicate that the service was performed by a licensed

professional, which it was not:

| Date/service | Service/other description | Associated code | QTY | CHARGE |
|---|---|---|---|---|
| 10/4/2000 | Medical-Surgical supplies | A4215 | 1 | 13.00 |
| 10/4/2000 | Medical-Surgical supplies | A4247 | 1 | 3.00 |
| 10/4/2000 | Medical-Surgical supplies | A4550 | 1 | 58.00 |
| 10/4/2000 | Medical-Surgical supplies | A4556 | 1 | 7.00 |
| 10/4/2000 | Medical-Surgical supplies | A6257 | 1 | 3.00 |
| 10/4/2000 | Medical-Surgical supplies | A4213 | 1 | 3.00 |
| 10/4/2000 | Oncology | 96450 | 1 | 167.00 |
| 10/4/2000 | Oncology | 96408 | 1 | 106.00 |
| 10/4/2000 | Laboratory | 82947 | 1 | 37.00 |
| 10/4/2000 | Laboratory | 84155 | 1 | 38.00 |
| 10/4/2000 | Laboratory | 85025 | 1 | 34.00 |
| 10/4/2000 | Laboratory | 89051 | 1 | 33.00 |
| 10/4/2000 | Laboratory | 36415 | 1 | 29.00 |
| 10/4/2000 | Pathology | 88107 | 1 | 57.00 |
| 10/4/2000 | Anesthesia | None identified | | 506.00 |
| 2/7/2001 | Surgical supply | A4213 | 1 | 3.00 |
| 2/7/2001 | Surgical supply | A4215 | 1 | 13.00 |
| 2/7/2001 | Surgical supply | A4550 | 1 | 58.00 |
| 2/7/2001 | Surgical supply | A4556 | 1 | 7.00 |
| 2/7/2001 | Surgical supply | A6257 | 1 | 3.00 |
| 2/7/2001 | Surgical supply | A6402 | 1 | 3.00 |
| 2/7/2001 | Oncology | 96408 | 1 | 106.00 |
| 2/7/2001 | Oncology | 96450 | 1 | 167.00 |
| 2/7/2001 | Laboratory | 82947 | 1 | 37.00 |
| 2/7/2001 | Laboratory | 84155 | 1 | 38.00 |
| 2/7/2001 | Laboratory | 85025 | 1 | 34.00 |
| 2/7/2001 | Laboratory | 89051 | 1 | 33.00 |
| 2/7/2001 | Pathology | 88107 | 1 | 57.00 |
| 0000658703 | | Total claim  CHARGES for 2  visits | | 1,653.00 |

73.    Upon submission of the foregoing UB-92 claims, Defendants

certified that:

a.     For Medicaid purposes:

This is to certify that the foregoing information is true, accurate, and complete.
I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws.

b.     For CHAMPUS purposes:

This is to certify that:
(a) the information submitted as part of this claim is true, accurate and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient. . .

74.     Plaintiff-Relators' expert on oncology coding and payment issues confirmed with the Medical Director of the Hawaii State Medicaid program in January 2006 that she would not have approved payments to Defendants on the above-listed claims had she known that DF was not licensed and credentialed or certified to perform the procedure(s).

75.     Patients DD, JHS, and KM are representative of the more than 150 patients on whom DF performed the procedures listed above in paragraph 32.a. during the relevant period before Winn ordered those procedures eliminated from her assignment in June 2001.

PARTICULARS OF NEONATOLOGY INTENSIVE CARE UNIT CLAIMS

76.     On information and belief, RST and MZ kept records of their

57

procedures similar to **Exhibit 2** or similar to the record DF kept in the daily
pediatric oncology schedule.

77.    On information and belief, the personnel files or KMCWC
evaluations of RST and MZ also contain summaries or other evidence of their
involvement in performing the procedures listed above in paragraph 32.b.

78.    RST and MZ were assigned to take regular shifts in the NICU.

79.    On information and belief, during the relevant period, the on-
call neonatologist employed by Defendant KMS would assign RST and MZ to be
the primary care provider for an entire shift for certain of the NICU inpatients, to
monitor those patients and perform any services or procedures RST or MZ decided
were necessary, such as clearing airways and reinserting dislodged endotracheal
tubes or vascular catheters, even though they were unlicensed and unqualified to
perform those procedures or provide those services under Hawaii State law at the
time.

80.    Defendants submitted all-inclusive claims for some Technical
Charges and allied professional services under daily NICU "room-and-board" to
most of the health care benefit program providers listed in **Exhibit 1**, including the
Hawaii State Medicaid Program; and under daily Ward "room-and-board" for
inpatients in the KMCWC nursery.  As a prerequisite to the submission of claims
for all-inclusive charges, it was required that a properly licensed professional

perform the services.

81.    Defendant KMS submitted separate claims to health care benefit programs for neonatologist services.

82.    Defendants submitted claims over and above the room-and-board claims for operating room charges, pharmacy, medical/surgical/supplies, laboratory, x-ray, anesthesiology, blood processing, nuclear x-ray, physical therapy, and other charges.

83.    In November 1999, the chief neonatologist employed by Defendant KMS admitted the following unlicensed activity to Defendants' compliance officer:

a.    On November 1, 1999, Defendants' compliance officer, Judy Fadrowski ("Fadrowski"), received a written complaint that RST and MZ were performing circumcisions outside the presence of attending physicians.

b.    Fadrowski requested that the chief neonatologist respond to the allegations and she received an explanatory memorandum containing the following facts:

i.    "Neonatal nurse practitioners" (RST and MZ and possibly other nurses) were permitted to perform circumcisions in the NICU treatment room and term nursery alone if they

59

were "comfortable" doing so; and

      ii.    Approximately 15 circumcisions were being

performed every month.

REPRESENTATIVE NICU FALSE CLAIMS

84.    Patient JA, a male in the 25th week of gestation, was admitted to

the KMCWC NICU immediately after his birth on June 12, 1999.  JA was covered

as a member of a Hawaii Medical Service Association-operated health care benefit

program, member number R20792506, KMCWC medical record number 908394.

85.    Defendant KMCWC participated with JA's HMSA plan under

an agreement providing in relevant part that "Participating Provider warrants that

at all times during the term of this Agreement it will comply with all applicable

local, state, and federal laws, rules and regulations, including but not limited to,

those regarding licensure. . ."

86.    JA was discharged from the KMCWC NICU on July 24, 1999,

to the inpatient ward, and was discharged from the hospital to his parents' care on

August 3, 1999.

87.    During his confinement to the NICU, JA underwent the

following invasive procedures which involved services of an unlicensed NICU

"nurse practitioner":  Intubation and mechanical ventilation, 6/12/99-7/20/99;

infant star oscillator, 6/12/99-7/9/99; conventional ventilator, 6/12/99, 7/4/99-

60

7/20/99; nasal CPAP, 7/20/99-7/23/99; nasal cannula, 7/23199 to present;

umbilical artery catheter, 6/12/99-6/24/99; umbilical venous catheter, 6/12/99-

6/21/99; percutaneous intravenous line, 6/21/99-7/18/99; head ultrasound, 6/16/99,

7/9/99, 7/16/99, 8/3/99; and Survanta, 6/12/99.

88.    Pursuant to their agreement with Hawaii Medical Service

Association("HMSA") Defendants charged the following Technical Charges of

$246,800.15:

a.    NICU room-and-board from June 12, 1999 through June

30, 1999, $43,206.00;

b.    NICU room-and-board from July 1, 1999 through July

23, 1999, $53,866.00;

c.    Ward room-and-board from July 24, 1999 through

August 3, 1999, $7,018.00;

d.    operating room charges, June 12 through August 3, 1999,

$2,188.00;

e.    pharmacy, June 12 through August 3, 1999, $85,913.32;

f.    medical/surgical/supplies, June 12 through August 3,

1999, $39,637.83;

g.    laboratory, June 12 through August 3, 1999, $44,200.00;

h.    x-ray, June 12 through August 3, 1999, $4,279.00;

        i.      anesthesiology, June 12 through August 3, 1999,
$1,023.00;

        j.      blood processing, June 12 through August 3, 1999,
$1,907.00;

        k.      nuclear x-ray, June 12 through August 3, 1999,
$6,702.00;

        l.      physical therapy, June 12 through August 3, 1999,
$1,060.00.

89.     HMSA paid Defendants $226,638.70 for the foregoing Technical Charges and allied health professional charges.

90.     Patient JA was readmitted on August 5, 1999 and discharged August 11, 1999, for which Defendants submitted claims to HMSA for Ward room-and-board and other charges in the amount of $14,458.00. HMSA paid Defendants $12,101.41 on the foregoing claims.

91.     Defendants materially breached the provision of their HMSA participating provider agreement requiring their compliance with all applicable local, state, and federal laws, rules and regulations, including those regarding licensure.

92.     Defendants' claims to HMSA for patient JA were fraudulent under the meaning of federal and state laws prohibiting the filing of false health care and false insurance claims.

93.     On information and belief, HMSA would not have paid the amount of $226,638.70 on Defendants' claims for patient JA or any other patient confined to the NICU during the relevant period, and would have demanded a refund of the amount paid had Defendants ever disclosed to HMSA the fact that the NICU "nurse practitioners" were not in fact licensed or credentialed to perform the procedures they were assigned.

94.     Defendants actively and knowingly concealed their receipt of payments for claims submitted on JA, and their noncompliance with the Hawaii State licensure law governing A.P.R.N. licenses and scope of practice, for the purpose of retaining greater compensation from HMSA and Medicaid programs than that to which Defendants were legally entitled.

95.     Patient JA, and the amount and number of claims Defendants submitted to HMSA while he was an inpatient, is representative of all other patients covered by various health care benefit programs including the Hawaii State Medicaid program, who were admitted to the NICU during the relevant period before Winn ordered those procedures eliminated from RST's and MZ's assignments in June 2001.

96.    On information and belief significant number of patients admitted to the NICU become beneficiaries of the Hawaii State Medicaid Program because Defendants' charges exceed the maximum benefits under their private plans or because they are otherwise qualified for health care assistance under Title XIX of the Act.

## PARTICULARS OF COST REPORT CLAIMS

97.    Defendants were required to file cost reports annually on or before the last day of the fifth month following the close of the cost report period under 42 U.S.C. § 1395g and 42 C.F.R. § 413.20(b).  The cost reports covered all interim requests for reimbursement under UB-92 claims such as those in the foregoing representative cases during the cost reporting year.

98.    The regulations required Defendants to audit and examine all of the claims submitted during the cost year.

99.    Each cost report Defendants filed contained the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT MAY BE
> PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE
> ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL
> LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS
> REPORT WERE PROVIDED OR PROCURED THROUGH THE
> PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR
> WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND
> ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT
> MAY RESULT.

100.    Defendants certified each report as follows:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF
PROVIDER(S)
I HEREBY CERTIFY that I have read the above statement and that I
have examined the accompanying electronically filed or manually
submitted cost report and the Balance Sheet and Statement of
Revenue and Expenses prepared by [name of facility, ID number of
facility] for the cost reporting period beginning [date] and ending
[date] and that to the best of my knowledge and belief, it is a true,
correct and complete statement prepared from the books and records
of the provider in accordance with applicable instructions, except as
noted. I further certify that I am familiar with the laws and regulations
regarding the provision of the health care services, and that the
services identified in this cost report were provided in compliance
with such laws and regulations.

The certification is followed by the signature of Defendants' officer, title and date.

101.    The Centers for Medicare and Medicaid Services (formerly the

Health Care Financing Agency) interpret the phase, "applicable instructions" to

encompass Medicare program requirements and thus all of the statutes and

regulations with which Defendants' participation required them to comply,

including the requirement of compliance with JCAHO rules, are encompassed

within the explicit language of Defendants' cost report certifications.

102.    The foregoing cost report certification is a condition of final

payment by the Medicare and Medicaid programs, and thus Defendants' cost

reports containing salary expenses for DF, RST, and MZ constituted false claims

because they were assigned to provide services for which they were not licensed or

qualified under Hawaii State law as required under the regulations.

103.    Defendants reported, inter alia, salaries of $502,054, including

DF's salary, for pediatric oncology in their cost report for the period July 1, 1997

through June 30, 1998, which included approximately nine months of the relevant

period.  The report of DF's salary as a reimbursable cost thus constituted a false

claim.

104.    Plaintiff-Relators have duly reported the foregoing information

to the Federal and State Governments, and on information and belief, the violations

alleged herein were occurring daily from after September 5, 1997 until June 6,

2001.

## SECOND CLAIM FOR RELIEF
### (VIOLATIONS OF 31 U.S.C. § 3730(H))

105.    Plaintiff-Relators reallege and incorporate herein by reference

the allegations contained in Paragraphs 1 - 104 of the Second Amended Complaint

and further allege as follows:

106.    Plaintiff-Relators began their employment with Defendant

KMS on September 1, 1997, a few days before the Subchapter 14 became effective

on September 5, 1997.

107.    Plaintiff-Relators were thus in a position during the relevant

period to observe DF performing the procedures listed above in paragraph 32.a. on

patients DD, JHS, KM, and others of the more than 150 patients on whom DF

performed those procedures; and were in a position to observe claim forms being prepared for entry into the computer system through which claims were ultimately submitted to health care benefit programs for Technical Charges and allied professional services.

108.    Plaintiff-Relators became concerned that billing practices in connection with the procedures DF performed were not in compliance with federal law and thus each made an independent compliance issue report to Defendants' central compliance officer.

109.    Defendants forwarded Plaintiff-Relators' complaints to Defendants' "independent reviewer," Deloitte & Touche, LLP.

110.    On information and belief, Deloitte & Touche requested on or around April 11, 2001 that Defendants engage Warren to head their review of the issue.

111.    Deloitte & Touche discovered that DF was not licensed in compliance with Subchapter 14.

112.    While interviewing DF on May 30, 2001, Deloitte & Touche learned that she had maintained in the PAU appointment schedule a record of the procedures she had performed, which could easily be used to identify millions of dollars in claims Defendants had submitted during the relevant period for Technical Charges to the various Medicaid programs with which Defendants

participated, and other Government-funded programs.

113.   Deloitte & Touche's investigation also uncovered the fact that RST and MZ were not licensed or qualified to perform the procedures they were performing daily in the NICU.

114.   Hallonquist and Winn had an emergency meeting with On Leng and Bucher on June 6, 2001 over Deloitte & Touche's findings (the "Emergency Meeting"). Winn ordered RST's and MZ's assignments changed on June 6, 2001.

115.   Hallonquist's notes of the Emergency Meeting indicate that she agreed with Winn and On Leng that nothing would be done to disclose the fact that the assignments Defendant KMCWC had given RST and MZ had exceeded the scope of practice for registered nurses, and that RST and MZ were not licensed or qualified under Subchapter 14 to perform the procedures they performed daily in the NICU.

116.   During the first two weeks of June 2001, Plaintiff-Relators independently learned from neonatology and other physicians of their acquaintance that Winn had instructed the neonatologists that RST and MZ were not to be allowed to perform procedures they had previously performed daily in the NICU.

117.   Hallonquist's notes of the Emergency Meeting also indicate a decision was reached to order Deloitte & Touche and Warren to make a false disclosure pertaining to pediatric hematology-oncology physician claims, for

which restitution would be relatively insignificant, as Defendants were required by their August 1999 CIA with the DHHS Office of Inspector General ("OIG") to disclose Plaintiff-Relators' complaints to the compliance officer, which might cause OIG investigators to audit all pediatric hematology-oncology claims.

118.    Deloitte & Touche and Warren proceeded to concoct a false disclosure involving pediatric hematology-oncology physician claims to the DHHS Office of Inspector General to misdirect government investigators and other auditors away from the Technical Charges false claims for procedures DF performed.  Warren laid the foundation for the false disclosure of under $100,000 in claims in telephone conferences with the OIG investigators before submitting it in writing on September 4, 2001.

119.    Defendants retaliated against Plaintiff-Relators by demanding their resignations from their employment with Defendant KMS on July 16, 2001.

120.    Plaintiff Wilkinson suffered serious health complications arising from the stress associated with the false accusations and ultimately decided to resign rather than fight and risk more serious health consequences.

121.    Plaintiff Woodruff refused to resign and Defendant KMS terminated her employment on January 8, 2002.  Litigation ensued in State court.

122.    Defendants resisted discovery efforts in the litigation, but early in the litigation Plaintiff Woodruff pieced together sufficient information, which

taken together with the information she collected in her investigation, that
Defendants had no legitimate concerns about claims Defendant KMS submitted for
physician's services, but were concerned about the existence of DF's diary.
Plaintiff-Relators reported this information to the Hawaii State Deputy Attorney
General in April 2001.

123.    Based upon Plaintiff Woodruff's information that DF had been
told she did not need a state nurse practitioner's license, Plaintiff-Relators decided
to conduct their own investigation into nurse practitioner licensing.  The Hawaii
State Department of Commerce and Consumer Affairs Professional Licensing
Division provided Plaintiff-Relators with the information that DF, RST, and MZ
obtained their A.P.R.N. licenses in August 2001.

124.    Plaintiff-Relators inquired about Medicaid local rules and
conditions of participation, and Defendants' participation agreements with other
health care benefit programs, and learned that all corporate provider contracts
require proper licensure of all personnel providing health care services.

125.    Defendant KMS terminated Plaintiff Woodruff's employment
as a full-time staff physician on January 8, 2002 in retaliation for her complaint
which led to the requirement to disclose the unlicensed activity to the OIG, and
because Defendants believed that Plaintiff Woodruff was a relator based upon the
evidence of an investigation she performed into the billings for procedures DF

performed. The investigation Plaintiff Woodruff conducted was outside the scope
of her ordinary duties.

126.    Other pediatric hematologist-oncologists who engaged in the
same conduct alleged against Plaintiff Woodruff were not terminated from their
KMS employment and no neonatologist was terminated. The only difference in
their respective behaviors was the fact that the other physicians did not investigate
billing issues with DF or any other "nurse practitioner."

127.    Plaintiff Woodruff was a full-time employee of Defendant
KMS prior to January 8, 2002.

128.    On January 13, 2002, Defendant KMCWC terminated Plaintiff
Woodruff's part-time employment as the Medical Director of the KMCWC
Pediatric Ambulatory Unit, which resulted in Plaintiff Woodruff losing her regular
faculty position with the Department of Pediatrics, John A. Burns School of
Medicine, University of Hawai`i.

129.    Defendant KMS demanded Plaintiff Wilkinson's resignation
falsely alleging that he had encouraged the staff physicians to commit "fraud."
Plaintiff Wilkinson had made a telephone "hotline" complaint regarding billing
issues with DF on February 11, 2001, which led to Defendants concluding that he
was also a relator.

130.    On December 31, 2001, Plaintiff Wilkinson resigned his half-

time employment with Defendant KMS under threat of termination of his employment and termination of his hospital privileges at KMCWC and eviction of his medical practice from its suite of offices in the Kapi`olani Medical Office Building.

131.    Accordingly, Defendants terminated Plaintiff-Relators' respective employment solely because Plaintiff-Relators raised issues with the billing by Defendant KMCWC for Technical Charges in connection with procedures DF performed.

132.    WHEREFORE, Plaintiff-Relators pray for judgment against Defendants, and each of them, jointly and severally, in favor of the United States, the State of Hawaii, the Plans listed in **Exhibit 1**, and Plaintiff-Relators Robert Wilkinson, M.D., and Kelley A. Woodruff, M.D., as follows:

A. That Plaintiff-Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(b) and H.R.S. §661-27.

B. That Plaintiff-Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(h).

C. That judgment be granted for Plaintiff-Relators and the State of Hawaii and against Defendants and for any costs, including, but not limited to, court costs, expert fees, investigative expenses and all attorneys' fees incurred by Plaintiff-Relators in the prosecution of this suit.

D. On behalf of the United States, for civil penalties of not less than $5,500.00 and not more than $11,000.00 for each violation, plus three times the amount of damages which the United States sustained, pursuant to 31 U.S.C. § 3729 and 3730 or as allowed by law.

E. On behalf of the State of Hawaii, for civil penalties of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages which the State of Hawaii sustained, pursuant to H.R.S. Chapter 661, Part II, or as allowed by law.

F. For any and all other relief that this Court deems just and proper, including restitution of all amounts paid to the Plans in Exhibit 1 upon false or fraudulent claims.

Dated: Honolulu, Hawai`i, January 30, 2007.

ARLEEN D. JOUXSON
RAFAEL G. DEL CASTILLO

Attorneys for Qui Tam Plaintiffs
Kelley Woodruff, M.D. and
Robert Wilkinson, M.D.