IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D.; STATE OF HAWAII, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D.; KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D. in their own behalf, | ) ) ) ) ) ) ) ) ) ) | CIVIL NO.  05-00521 JMS/LEK<br><br>ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| HAWAI'I PACIFIC HEALTH; KAPI'OLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; AND KAPI'OLANI MEDICAL SPECIALISTS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## I. INTRODUCTION

On February 20, 2007, Defendants Hawai'i Pacific Health, Kapi'olani

Medical Center for Women and Children ("KMCWC"), and Kapi'olani Medical

Specialists (collectively "Defendants") filed a motion to dismiss the Second

Amended Complaint filed by Kelley A. Woodruff, M.D. and Robert Wilkinson,

M.D. (collectively "Plaintiffs").  Plaintiffs' *qui tam* action, filed pursuant to the

federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. and the Hawaii False

Claims Act, Hawaii Revised Statues ("HRS") § 661-21, *et seq*., alleges that

Defendants submitted false claims to Medicaid and other government-funded

programs.  Defendants move to dismiss the first claim in Plaintiffs' Second

Amended Complaint, which alleges violations of 31 U.S.C. § 3729(a)(1), (2), and

(3) and HRS § 661-21(a)(1), (2), and (3).

Based on the following, the court DENIES Defendants' motion with

respect to Plaintiffs' allegations that Defendants submitted facially false claims.

The court GRANTS the motion with respect to Plaintiffs' "false certification" and

"promissory fraud" theories of liability.

## II. **BACKGROUND**

### A. **Procedural History**

The instant motion represents Defendants' third motion to dismiss

this case.  The facts of the case are set forth in the court's previous Order dated

October 3, 2006 (Doc. No. 45).  Briefly, Plaintiffs allege that Defendants filed

false claims for the payment of charges associated with procedures performed by

unlicensed nurse practitioners.

The court dismissed Plaintiffs' original Complaint and granted Plaintiffs' motion to amend on October 3, 2006 (Doc. No. 45).  On October 16, 2006, Plaintiffs filed a First Amended Complaint, which the court dismissed by Order dated February 5, 2006 (Doc. No. 69).  The court allowed Plaintiffs to file a Second Amended Complaint in order to clarify which statute, law or regulation Plaintiffs allege is the basis for their false certification claim.  At the January 16, 2007 hearing on Defendants' Motion to Dismiss the First Amended Complaint, the court instructed Plaintiffs' counsel that he needed "to be very explicit as to what he's relying on for the false certification."  Hr'g Tr. 18, Jan. 16, 2007.

**B.      Plaintiffs' Second Amended Complaint**

Plaintiffs filed their Second Amended Complaint on January 30, 2007.  Plaintiffs allege that Medicaid and other government-funded programs "paid Defendants for facilities, supplies, equipment, pharmacy, diagnostic and other non-professional technical components . . . based on Defendants' submission of false claims and false certifications of compliance with Federal and State laws and regulations and conditions of participation[.]"  2d Am. Compl. ¶ 4.  According to Plaintiffs, Defendants submitted charges to Hawaii's Med-QUEST program for procedures performed by nurses who were not licensed to perform them.

3

The 2d Amended Complaint sets forth examples of different types of allegedly false claims.  First, it alleges that Defendants submitted (1) inaccurate UB-92 forms[1] for reimbursement of charges associated with the procedures performed by the unlicensed nurses and (2) cost reports based on the UB-92 forms.  The UB-92 forms list charges for supplies, room charges, laboratory and pathology charges, and oncology charges.[2]  2d Am. Compl. ¶¶ 63, 68, 72.  According to Plaintiffs, the UB-92 forms constitute false claims because

---

[1] The Second Amended Complaint identifies the UB-92 form as the Centers for Medicare & Medicaid Services ("CMS") form 1450.  2d Am. Compl. ¶ 58.  The form is used for the billing of "institutional charges" to most Medicaid State Agencies.  *See* Institutional Paper Claim Form (CMS-1450) *at* http://www.cms.hhs.gov/ElectronicBillingEDITrans/15_1450.asp (last viewed May 16, 2007).  According to the Second Amended Complaint:

> Med-QUEST further requires that physicians and nurse practitioners who are Medicaid providers to submit claims independent of the hospital for services that they actually provided, and prohibits hospitals from submitting claims for such professional services on a UB-92 claim form.  UB-92 claims for cost reimbursement of hospital services constitute allowable costs if a professional claim is submitted for the service on a HCFA 1500 claim, as long as documentation exists to prove that the professional initiated the claim, thereby representing the professionals' direct involvement in the procedure which was the basis for the UB-92 claim for cost reimbursement.

2d Am. Compl. ¶ 26.d.iii.  Thus, there is a distinction between "institutional charges," which are submitted by the hospital or institution on the UB-92 form and "professional services," which are submitted by the physician or nurse practitioner on the HCFA 1500 form.  The CMS-1500 form is the standard claim form used by a non-institutional provider or supplier.  *See* Professional Paper Claim Form (CMS-1500) *at* http://www.cms.hhs.gov/ElectronicBillingEDITrans/ 16_1500.asp (last viewed May 16, 2007).

[2] Plaintiffs refer to these charges throughout the Second Amended Complaint as "non-professional technical components," "allied health professional" services, or "technical charges."  2d Am. Compl. ¶¶ 4, 56.

Defendants used Health Common Procedure Coding system ("HCPCs") codes that "falsely implied that the procedures for which it was seeking cost reimbursement were performed by a licensed professional or incident to the licensed professional's services when neither of the foregoing prerequisites for submitting UB-92 form claims with the HCPCs codes were met . . . ."  2d Am. Compl. ¶ 26.e.i.b.  In other words, Defendants "used codes Med-QUEST authorized for describing services that were performed by a physician, to make claims for unlicensed procedures, for which there were no Med-Quest authorized codes."  Pls'. Mem. Opp'n 5.

Second, Plaintiffs allege that Defendants falsely certified compliance with all federal and state laws and regulations in the Medicaid Provider Agreement and submitted UB-92 forms and periodic cost reports classifying the unlicensed procedures as allowable costs ("false certification claims").  These false certification claims are based on violations of the conditions of participation in Medicare, Medicaid, and other government-funded programs.

Third, Plaintiffs claim that Defendants misrepresented that all of their personnel were properly licensed to performed their assigned duties in order to "obtain a contract to continue [their] participation with the Med-QUEST

program . . . ."  ("promissory fraud claims").   2d Am. Compl. ¶¶ 26.i.  Plaintiffs

allege that Defendants knew that nurses were performing procedures for which

they were not licensed when Frances Hallonquist (CEO of KMCWC) signed a

Hawaii Medicaid Provider Agreement and Condition of Participation ("Provider

Agreement") on November 11, 1999.[3]

## C.    Defendants' Motion to Dismiss Second Amended Complaint

Defendants move to dismiss on the grounds that the Second Amended

Complaint "does not cite any statute, rule or regulation that prohibits the

submission of claims for Technical Charges if a procedure has been performed by

nurse practitioners who allegedly lacked the proper license."  Defs'. Mem. Supp. 2.

With respect to the UB-92 forms, Defendants argue that they were not

false on their face because "there is no field that asks for the license status of any

individual" and the forms do "not ask for the identity of the individual who

performed the service or procedure."  Defs'. Mem. Supp. 19.  According to

Defendants, Plaintiffs misstate the information required by the UB-92.

Defendants also argue that a false certification cause of action must

allege a violation of a law that the government mandates as a condition of

_____

[3] Specifically, the Second Amended Complaint alleges that "Defendants obtained the medical assistance payments to which they were never entitled through deceit and misrepresentation by withholding material facts from Med-QUEST when CEO Hallonquist executed the November 1999 participation contract . . . ."  2d Am. Compl. ¶ 27.a.

payment.  Therefore, according to Defendants, Plaintiffs have not stated a claim under the false certification theory because violations of the Provider Agreement or other conditions of participation are not conditions of payment.

Further, it was not Defendants, but Plaintiffs who were responsible for the billing of invasive procedures performed by nurse practitioners in violation of billing policy, according to Defendants.  When Defendants discovered that the procedures were billed under a physician's provider number, they made a Voluntary Disclosure Submission and refunded money paid for procedures performed from February 1997 through July 2001.  *See* Defs'. Mem. Supp. 2. Defendants claim that the "Technical Charges" that were not refunded are for items that are necessary for patient care and would be required no matter who was providing the service.

Finally, Defendants claim that Plaintiff Woodruff has taken positions directly contrary to the position taken in this *qui tam* action in a separate action pending in state court.  Plaintiffs apparently disagreed with Defendants' decision to stop submitting claims for procedures performed by nurse practitioners and Plaintiff Woodruff argued in the state court action that Hawaii Medicaid rules permit the supervising physician to be in the same office when an invasive procedure is performed by a nurse practitioner.  *See* Defs'. Mem. Supp. 9.

According to Defendants, although Plaintiffs now allege that the claims were false, they defended the practice of billing for procedures performed by nurse practitioners as legal in the state forum (as well as facilitated and engaged in the practice themselves).  Defendants argue that Plaintiffs should be estopped from taking inconsistent positions with respect to the lawfulness of the billing policy.

A hearing on the motion was held on April 9, 2007.  Based on the following, the court DENIES in part and GRANTS in part Defendants' motion.

### III.  <u>STANDARD OF REVIEW</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a motion to dismiss a claim for "failure to state a claim upon which relief can be granted[.]"  When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a court takes the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.  *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001).  "Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss."  *Id.*  Under Rule 12(b)(6), a complaint should not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988) (*quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  "Dismissal can be based

on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Id.*

Generally, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee*, 250 F.3d at 688 (citation omitted). Rule 12(b)(6) provides that when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties that be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Conversion of 12(b)(6) motion into a summary judgment motion takes place at the discretion of the district court and only when it affirmatively decides to consider the additional material. *See Swedberg v. Marotzke*, 339 F.3d 1139, 1144 (9th Cir. 2003).

Exceptions permit limited consideration of extrinsic evidence when considering a Rule 12(b)(6) motion.

> First, a court may consider material which is properly submitted as part of the complaint on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them. Second, under Fed. R. Evid. 201, a court may take judicial notice of matters of public record.

*Lee*, 250 F.3d at 688-89 (citations, quotation signals, and ellipses omitted).

## IV. ANALYSIS

Plaintiffs allege that Defendants are liable for violations of FCA

sections 3729(a)(1), (2), and (3) and the corresponding provisions of the Hawaii

False Claims Act.  It is unlawful under the FCA to

> (1) knowingly present[], or cause[] to be presented, to an
> officer or employee of the United States Government or a
> member of the Armed Forces of the United States a false or
> fraudulent claim for payment or approval;
> (2) knowingly make[], use[], or cause[] to be made or used, a
> false record or statement to get a false or fraudulent claim paid
> or approved by the Government;
> (3) conspire[] to defraud the Government by getting a false or
> fraudulent claim allowed or paid[.]

31 U.S.C. § 3729(a).  The essential elements of FCA liability are:  "(1) a false

statement or fraudulent course of conduct, (2) made with scienter, (3) that was

material, causing (4) the government to pay out money or forfeit moneys due."

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir.

2006).  The Second Amended Complaint alleges several possible theories of

liability:  (1) actual false claims; (2) false certification of claims; and (3)

promissory fraud.  The court addresses each theory in turn.

As a preliminary matter, the court will not convert Defendants'

motion to dismiss into one for summary judgment.  Defendants attach several

10

exhibits to their motion including the Provider Agreements (Exs. D, E), Plaintiff Woodruff's settlement conference statement from the state court action (Ex. C), a sample UB-92 form (Ex. F), and excerpts from the Medicare Claims Processing Manual (Ex. G).  The court has discretion to convert the motion to one for summary judgment, but given the record before it, declines to do so.  The court will not consider any material beyond the pleadings.

## A.    Facially False Claims

Plaintiffs claim that "the UB-92 forms in issue were false and fraudulent on their face, under the meaning of  31 U.S.C. § 3729(a)(1)."  Pls'. Mem. Opp'n 3-4.  Defendants dispute Plaintiffs' allegations regarding the requirements for UB-92 forms and assert that the claims for payment excerpted in the Second Amended Complaint are not actually false.[4]

"In an archetypal *qui tam* False Claims Act action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent."  *Hendow*, 461 F.3d at 1170.  Plaintiffs allege that Defendants submitted UB-92 forms that were literally false.

---

[4] To the extent Defendants urge the court to decline to consider this theory of liability because it is a new theory first raised in the Second Amended Complaint, the court disagrees. Plaintiffs previously raised the issue of the UB-92 claims for payment and related costs reports in their First Amended Complaint, although they further elaborate on the significance of the billing codes in the Second Amended Complaint.

The Second Amended Complaint states that "Med-QUEST requires providers to identify the licensed attending physician in field 82 of the UB-92 claim, and to identify in field 83 any other licensed physician or other licensed professional who performed a procedure on which the claim for provider services is based." 2d Am. Compl. ¶ 26.e.  Defendants allegedly used codes indicating that the services were performed by a physician or licensed professional, when they were not.  *See* 2d. Am. Compl. ¶¶ 63, 68, 72.  Further, "Defendants withheld the material fact that the procedures . . . were performed by unlicensed personnel each time it submitted a periodic cost report which included the costs claimed on the UB-92[.]"  2d. Am. Compl. ¶ 26.e.i.a.  Plaintiffs sufficiently state a claim that Defendants made claims for payment that were literally false or fraudulent.

Defendants argue that the Second Amended Complaint misstates the information required by the UB-92.  According to Defendants, the UB-92 "does not request or require the identities of the medical personnel who performed services or procedures on patients under the care of an admitting physician, and in no event does the UB-92 request the identity or [unique physician identification number], if any, of non-physician medical personnel."  Defs'. Reply 11.

\\\\

\\\

12

Defendants' challenge to the factual sufficiency of the UB-92 claims

is misplaced in the Rule 12(b)(6) context.

> [W]hen the legal sufficiency of a complaint's allegations is
> tested by a motion under Rule 12(b)(6), review is limited to the
> complaint.  All factual allegations set forth in the complaint are
> taken as true and construed in the light most favorable to
> plaintiffs.  Indeed, factual challenges to a plaintiff's complaint
> have no bearing on the legal sufficiency of the allegations
> under Rule 12(b)(6).

*Lee*, 250 F.3d at 688 (citations and quotation signals omitted).  Assuming, as the

court must, the truth of the factual allegations in the Second Amended Complaint,

Plaintiffs have stated a claim based on the facially false UB-92 claims and

concomitant cost reports.

## B.     False Certification Claims

The FCA does not limit liability to facially false or fraudulent claims

for payment.  Rather, the "broad construction of a 'false or fraudulent claim' [has]

given rise to two doctrines that attach potential [FCA] liability to claims for

payment that are not explicitly and/or independently false:  (1) false certification

(either express or implied); and (2) promissory fraud."  *Hendow*, 461 F.3d at

1171.[5]  Plaintiffs appear to allege both in their Second Amended Complaint.

---

[5] "[U]nder either the false certification theory or the promissory fraud theory, the essential elements of FCA liability are the same: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or

(continued...)

Plaintiffs' false certification theory is premised on the claim that Defendants "made express certifications and promises in signing the Med-QUEST participation agreements and falsely certified costs reports."  Pls'. Mem. Opp'n 19. Defendants argue that, in order for a false statement to become a false claim, it must serve as a prerequisite to payment by the government, which did not occur here because Plaintiffs merely allege that Defendants violated conditions of participation in the government-funded programs.

### 1.    *Legal Framework for False Certification Claims*

The Ninth Circuit most recently addressed the false certification theory in *Hendow*, observing that "a claim under the False Claims Act can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment."  *Hendow*, 461 F.3d at 1171.  The relators in *Hendow* alleged that the University of Phoenix knowingly made false promises that it would comply with an incentive compensation ban in order to become eligible to receive federal funding.  In order to receive federal subsidies under Title IV of the Higher Education Act, the university had to enter into a Program Participation Agreement with the Department of Education, in which it agreed to

---

[5] (...continued)
forfeit moneys due."  *Hendow,* 461 F.3d at 1174.

abide by statutory, regulatory, and contractual requirements, including a ban on incentive compensation based on student enrollment. *Id.* at 1168. The relators alleged that the university falsely certified each year that it was in compliance with the incentive compensation ban, while knowingly violating that requirement. *Id.* at 1169. *Hendow* reviewed prior Ninth Circuit case law, as well as law from other circuits, and concluded that relators stated a claim under the FCA.

*Hendow* first discussed the Ninth's Circuit's leading case on false certification, *United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996). *Anton* "explained the theory of false certification, identifying two major considerations: 'whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering [the] Government's loss.'" *Hendow,* 461 F.3d at 1171 (*quoting Anton*, 91 F.3d at 1266) (citations omitted). *Anton* was clear that violations of laws, rules, or regulations alone do not create a cause of action under the FCA.

> It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit . . . . Mere regulatory violations do not give rise to a viable FCA action. This is particularly true here where regulatory compliance was not a *sine qua non* of receipt of state funding.

*Anton*, 91 F.3d at 1266-67.  Thus, the Ninth Circuit made clear in *Anton* that merely alleging violations of federal statutes while receiving funds is insufficient to state a claim under the FCA; a plaintiff must allege that the false certification of compliance was a prerequisite to obtaining the government benefit.  *Id.*  *Hendow* states that "[t]his approach has been followed by a number of other circuits to adopt the false certification theory of false claims liability" and cites *Mikes v. Straus*, 274 F.3d 687 (2d. Cir. 2001), as an example.  *Hendow*, 461 F.3d at 1172.

  *Mikes*, like the instant case, dealt with Medicare claims.  The relators in that case alleged that compliance with portions of the Medicare statute was a precondition to a request for federal funds and that submission of a HCFA-1500 form "attests by implication to the providers' compliance" with the Medicare statute.  *Mikes*, 274 F.3d at 700.  *Mikes* concluded that, because the Medicare statute at issue does not "condition *payment* on compliance with its terms, defendants' certifications on the HCFA-1500 forms are not legally false."  *Id.* at 702.  The court limited FCA liability premised on a legally false certification to those situations where a party certifies compliance with an underlying statute or regulation as a condition of payment.  This rule serves the FCA's limitation to impose liability only where a certification of compliance influences the government's decision to pay.  *See id.* at 697 (holding that the FCA "does not

encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions").

The parties dispute the effect of *Hendow* and its treatment of the *Mikes* decision. *Mikes* held that "a claim under the [FCA] is legally false only where a party certifies compliance with a statute or regulation as a condition to government payment." *Id.* at 697. *Hendow* distinguished *Mikes* ("in the Medicare context") from government funding under the Higher Education Act program. *Hendow* examined Title IV and the Higher Education Act and concluded that "the eligibility of the University under Title IV and the Higher Education Act of 1965 -- and thus, the funding that is associated with such eligibility -- is *explicitly* conditioned, in three different ways, on compliance with the incentive compensation ban." *Id.* at 1175. *Hendow* held that "compliance with the incentive compensation ban is a necessary condition of continued eligibility and participation . . . . The statute, regulation and agreement here all explicitly condition participation and payment on compliance with . . . the precise requirements that relators allege that the university knowingly disregarded." *Hendow*, 461 F.3d. at 1176.

*Hendow* thus rejected the university's argument that the ban was merely a condition of participation, not a condition of payment, in the context of Title IV and the Higher Education Act:

> [I]n this case, that is a distinction without a difference. *In the context of Title IV and the Higher Education Act*, if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all -- and thus, an educational institution could flout the law at will. . . . [T]hese and all other promises to comply with the Program Participation agreement, are conditions of payment.  These conditions are also 'prerequisites,' and 'the *sine qua non*' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid.

*Id.* at 1176 (emphasis added).  *Hendow* further observed that, "the *Mikes* court was dealing with the Medicare context, to which the court specifically confined its reasoning."  *Id.* at 1177.

Plaintiffs urge the court to expand *Hendow*'s reasoning into the Medicare context.  Plaintiffs, however, do not allege that the "statute, regulation and agreement here all explicitly condition participation and payment on compliance," as the court found in *Hendow*.  *Id.* at 1176.  Defendants argue that, under the impermissibly broad expansion sought by Plaintiffs, essentially all conditions of participation would give rise to liability under the FCA.  The parties have not cited and the court has not found any case holding that violations of conditions of participation are sufficient to state a claim under the FCA based on

18

false certification of Medicare or Medicaid claims.  The court agrees that *Hendow* does not purport to create a sweeping new rule that all conditions of participation give rise to liability under the FCA.  In fact, *Hendow* distinguishes *Mikes*; it does not disavow its holding.[6]

In the Medicare and Medicaid context, the *Mikes* reasoning is more appropriate to the statutory and regulatory framework underlying the programs. *See United States ex rel. Willard v. Humana Health Plan*, 336 F.3d 375, 382 (5th Cir. 2003) (affirming dismissal of plaintiff's Medicare FCA case, concluding that "compliance with the regulations Willard alleges Humana violated was not a condition of payment under the contract"); *United States ex rel. Bailey v. Ector County Hosp.*, 386 F. Supp. 2d 759, 765 (W.D. Tex. 2004) (granting summary judgment to defendant in Medicare FCA case, holding that the "crucial question is whether the certification of compliance with a particular regulation or statute was a condition for payment by the government.  Relator presents nothing establishing that Defendants made a false certification of compliance, either implied or express,

---

[6] Plaintiffs make much of *Hendow*'s dicta that "[i]f the allegation had been that the defendants in *Mikes*, were not even trying to comply . . . we imagine the *Mikes* case would have come out differently."  *Hendow*, 461 F.3d at 1177.  The court is not persuaded.  First, as dicta, this statement is not binding on this court.  *See United States v. Armijo*, 5 F.3d 1229, 1233 (9th Cir. 1993).  Moreover, the court reads this statement together with the sentence that follows it: "And even if it would not have, the *Mikes* court was dealing with the Medicare context, to which the court specifically confined its reasoning."  *Id.*

as a condition of payment") (citations omitted); *In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 336 (D. Conn. 2004) (holding in a Medicare FCA case that "[t]his is not a case where the allegedly false claims are premised solely on a regulatory violation that was not a condition to payment.  The Government is challenging the claims because they allegedly violated the underlying condition to payment. . . .  Thus, defendants' motion to dismiss the complaints on the ground that they allege no more than a regulatory violation is denied."); *Sweeney v. ManorCare Health Servs., Inc.*, 2005 WL 4030950 at *5 (W.D. Wash. 2005) (dismissing plaintiff's Medicare FCA complaint, "where full regulatory compliance is not a requirement for receipt of federal funding.  [Plaintiff] does not allege that the regulatory violations were conditions of payment.  The regulation violations [plaintiff] points to are conditions of participation in the Medicare and Medicaid programs.  Moreover, there are administrative and other remedies for regulatory violations.") (citations omitted).

       The court concludes that, in order for Plaintiffs to state a claim based on the false certification theory, they must allege that Defendants violated a statute, regulation, or other law upon which the government conditions payment of Medicare or Medicaid claims.

### 2.      *Plaintiffs Fail to State a False Certification Claim*

Plaintiffs argue that Defendants "made express certifications and promises in signing the Med-QUEST participation agreements and falsely certified cost reports." Pls'. Mem. Opp'n 19. They allege that Defendants falsely certified compliance with Hawaii state licensing laws and federal regulations (including 42 C.F.R. §§ 482.1, 482.11, 482.23(b) and (c), and 482.54). *See* 2d Am. Compl. ¶ 26.d.i. The court concludes that Plaintiffs have failed to state a false certification claim with respect to the Provider Agreements and cost reports.[7]

---

[7] Although the Second Amended Complaint is far from clear regarding Plaintiffs' various theories of liability, their memorandum alternatively refers to both "false certification" and "implied false certification," while Plaintiffs' counsel identified their claims as based on "express" and "implied false certification" at the April 9, 2007 hearing.

*Mikes* distinguishes express and implied false certification. "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Mikes*, 274 F.3d at 698. Conversely, an "implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition of payment." *Id.* at 699. *Mikes* concluded that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* at 700.

With respect to the implied certification theory, *Mikes* cautioned "not to read this theory expansively and out of context." *Id.* at 699. The rationale underlying the theory

> does not fit comfortably into the health care context because the False Claims Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations -- but rather only those regulations that are a precondition to payment -- and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach.

*Id.* at 699. The court agrees with this reasoning in *Mikes*. *Hendow* declined to address the viability of the implied certification theory on the facts before it, explaining that:

(continued...)

*a.      Provider Agreements*

The Second Amended Complaint alleges that Defendants were

"required to certify compliance with all federal and state laws and regulations as a

prerequisite to participation, in order for Med-QUEST, the QUEST plans, and

Medicare to accept their respective participation contracts."  2d Am. Compl.

¶ 26.a.  Defendants allegedly "assigned personnel to perform acts and duties . . . in

violation of Hawaii State licensing laws, and thus was not in compliance with all

federal and state laws and regulations at the time it submitted contracts for

---

[7](...continued)

> Some courts, such as the Court of Federal Claims, have adopted a
> version of the false certification theory whereby the certification need only
> be implied, rather than express.  In those cases, if a party submits a claim
> for payment under a government program with requirements for
> participation, that claim is taken as an implied certification that the party
> was in compliance with those program requirements.  *See Ab-Tech
> Constr., Inc. v. United States*, 31 Fed.Cl. 429, 434 (Fed.Cl.1994).  Here,
> we need not address the viability of this theory, because it is beyond
> dispute that the University signed the written Program Participation
> Agreement, thus making an express statement of compliance.

*Hendow*, 461 F.3d at 1172 n.1.  *Hendow* did incorporate, in a somewhat confusing manner,
language from *Mikes* regarding the implied false certification theory.  *Hendow* states that *Mikes*
"imposed an additional requirement on Medicare cases:  that the underlying statute 'expressly'
condition payment on compliance.  An explicit statement, however, is not necessary to make a
statutory requirement a condition of payment, and we have never held as much."  *Id.* at 1177.
This requirement from *Mikes,* however, related to that court's conclusion that "implied false
certification is appropriately applied only when the underlying statute or regulation upon which
the plaintiff relies *expressly* states the provider must comply in order to be paid."  *Mikes*, 274
F.3d at 700.  It is unclear why *Hendow* engrafted this requirement for implied false certification
from *Mikes* into its discussion, since implied false certification was not before the court in
*Hendow*.  In any event, under either the express or the implied false certification theory, Plaintiffs
have not shown that any condition of payment was violated.

participation for acceptance by Med-QUEST, the QUEST plans, and Medicare, constituting false certification." 2d Am. Compl. ¶ 26.a.i.

Plaintiffs do not allege that compliance with the state licensing law at issue was a condition of payment under the Med-QUEST Provider Agreements.[8] In fact, Plaintiffs have not identified any law upon which payment was conditioned. Violations of conditions of participation in the Provider Agreements are insufficient; Plaintiffs, therefore, fail to state a false certification claim.

b.    *Periodic cost reports*

Defendants were required to certify periodically that they complied with all federal and state laws when providing services for which they submitted claims for cost reimbursement. 2d. Am. Compl. ¶ 26.d.i.[9] Plaintiffs allege that

---

[8] Instead, Plaintiffs allege that the invasive procedures at issue "could only be performed by a licensed, properly credentialed physician, or a specially credentialed Advanced Practice Registered Nurse/Nurse Practitioner ("APRN") licensed by the State of Hawaii under Title 16, Chapter 89, Subchapter 14 of the Hawaii Administrative Rules ("HAR") § § 16-89-75 though 97." 2d Am. Compl. ¶ 33. These administrative rules detail the requirements for recognition as an APRN and describe different practice specialties and fees for APRNs; the rules are silent on who may perform the invasive procedures at issue. The HAR cited by Plaintiffs do not purport to limit the procedures which may be performed by a non-licensed APRN and are not a condition of payment.

[9] According to Plaintiffs, Defendants certified cost reports as follows:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses

(continued...)

cost report claims "for reimbursement of any costs for inpatient or outpatient services connected with an unlicensed act were false claims . . . because pediatric oncology and the NICU never complied with the conditions of participation and therefore any costs were unallowable." 2d. Am. Compl. ¶ 26.d.v.  Plaintiffs cite several Medicare regulations that were allegedly violated by Plaintiffs in order to show that Defendants falsely certified compliance on the cost reports.  A review of these regulations reveals that they are expressly "conditions of participation" in the Medicare program.[10]  Plaintiffs do not claim that any of the regulations allegedly violated by Defendants are conditions of payment.  Because Plaintiffs have again failed to allege that Defendants violated a law upon which the government conditions payment of claims, they have failed to state a false

---

[9] (...continued)

> prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

2d. Am. Compl. ¶ 100.

[10] The Second Amended Complaint cites several regulations from Part 482 of 42 C.F.R., Chapter IV.  Part 482 is entitled "Conditions of Participation for Hospitals."  Each of the regulations cited is a "condition of participation."  *See, e.g.,* 42 C.F.R.  482.11(a) ("The hospital must be in compliance with applicable Federal laws related to the health and safety of patients."); 42 C.F.R. 482.23 (entitled "Condition of participation: nursing services"); 42 C.F.R. 482.54 (entitled "Condition of participation: Outpatient services").

certification claim with respect to the cost reports.  Plaintiffs' claims based on the false certification theory of liability are DISMISSED.

## C.    Promissory Fraud Claims

Plaintiffs appear to assert a claim under the FCA based on promissory fraud.  The Second Amended Complaint alleges that Defendants "did not comply with all federal and state laws and regulations in providing services to patients . . . while it participated with Med-QUEST, the QUEST plans, and Medicare during the relevant period, constituting promissory fraud."  2d Am. Compl. ¶ 26.a.ii.  Although unclear, the factual underpinnings of the promissory fraud claim appear to be the same as those relating to the false certification theory.

*Hendow* described the promissory fraud theory as an "approach to finding False Claims Act liability in the absence of an explicitly false claim." *Hendow*, 461 F.3d at 1173.

> This theory, rather than specifically requiring a false statement of compliance with government regulations, is somewhat broader.  It holds that liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct.

*Id*.  *Hendow* cites *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005) with approval.

> To prevail in this suit relator must establish that the University not only knew . . . that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark.  This distinction is commonplace in private law:  failure to honor one's promise is (just) breach of contract, but making a promise that one *intends* not to keep is fraud. . . .  [I]f the University knew about the rule and told the Department that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.

*Hendow*, 461 F.3d at 1174 (*quoting Main*, 426 F.3d at 917).  The Ninth Circuit has held that for promissory fraud to be actionable under the False Claims Act, "the promise must be false when made."  *Anton*, 91 F.3d at 1267.  Further, "innocent mistakes, mere negligent misrepresentations and differences in interpretations are not sufficient for False Claims Act liability to attach.  In short, therefore, under a promissory fraud theory, relator must allege a false or fraudulent course of conduct, made with scienter."  *Hendow*, 461 F. 3d at 1174 (citations and quotations signals omitted).[11]

Plaintiffs allege that Defendants withheld material facts from Med-QUEST when they signed the 1999 Participation Agreement.

---

[11] *Hendow* further noted that "the promissory fraud theory, in substance, is not so different from the false certification theory, and even requires the same elements." *Hendow,* 461 F.3d at 1174.  "[U]nder either the false certification theory or the promissory fraud theory, the essential elements of FCA liability are the same: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.*

> Defendants knew that the nurses were performing assigned duties for which they were not licensed pursuant to Hawaii State law when Frances A. Hallonquist . . . signed a HAWAII STATE MEDICAID PROGRAM PROVIDER AGREEMENT AND CONDITION OF PARTICIPATION on November 11, 1999, while Defendant KMCWC was subject to the [Corporate Integrity Agreement] requiring it to make a full confession of any possible violations of federal or state laws, regulations, rules or procedures.
>
> . . . .
>
> Defendants obtained the medical assistance payments to which they were never entitled through deceit and misrepresentation by withholding material facts from Med-QUEST when CEO Hallonquist executed the November 1999 participation contract, and when Defendant subsequently submitted UB-92 claims for interim reimbursement of costs for unlicensed services, and periodic cost reports including unallowable costs for unlicensed services.

2d. Am. Compl. ¶ 27, 27.a.  Plaintiffs sufficiently allege a false or fraudulent course of conduct by Defendants with respect to the 1999 Provider Agreement.

The promissory fraud theory, however, also requires, "as with the false certification theory . . . that the underlying fraud be material to the government's decision to pay out moneys to the claimant." *Hendow*, 461 F.3d at 1174.  Thus, there must be a causal connection between the fraud and the payment. *Id.*  Plaintiffs have not sufficiently alleged that Defendants "engaged in statements or courses of conduct that were *material* to the government's decision with regard to funding." *Id.* at 1177.  As with Plaintiffs' false certification allegations, their

promissory fraud claims must fail because there is no allegation that Defendants "fraudulently violated a regulation upon which payment is expressly conditioned." *Id.* Plaintiffs' claims based on the promissory fraud theory of liability are DISMISSED.

## D.    Judicial Estoppel

According to Defendants, although Plaintiffs now allege that the claims were false, they defended the practice of billing for procedures performed by nurse practitioners as legal in the state forum.  Defendants urge that Plaintiffs be estopped from taking inconsistent positions with respect to the lawfulness of the billing policy.

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  Judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Id*. (citation omitted).

Many factors typically inform the decision whether to apply judicial estoppel:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly

> inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.
>
> In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel.  Additional considerations may inform the doctrine's application in specific factual contexts.

*Id.* at 750-51.  On the record before the court, it is not possible to determine whether Plaintiff Woodruff succeeded in persuading the state court to accept her earlier position.  "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus no threat to judicial integrity."  *Id.*  Because there is not a sufficient record before the court at this stage, judicial estoppel is not appropriate.

## V.  <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss is DENIED in part and GRANTED in part.  Plaintiffs' claims with respect to the

\\\

\\\

29

submission of facially false claims survive.  Plaintiffs' claims based on the "false

certification" and "promissory fraud" theories of liability are DISMISSED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 18, 2007.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States of America ex rel. Woodruff et al. v. Hawai'i Pacific Health., et al.*, Civ. No. 05-00521 JMS/LEK, Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Second Amended Complaint