IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D.; STATE OF HAWAII, ex rel. KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D.; KELLEY A. WOODRUFF, M.D. AND ROBERT WILKINSON, M.D. in their own behalf,<br><br>              Plaintiffs,<br><br>      vs.<br><br>HAWAIʻI PACIFIC HEALTH; KAPIʻOLANI MEDICAL CENTER FOR WOMEN AND CHILDREN; AND KAPIʻOLANI MEDICAL SPECIALISTS,<br><br>           Defendants.<br>_____ | CIVIL NO.  05-00521 JMS/LEK<br><br>ORDER (1) GRANTING PLAINTIFFS' EX PARTE MOTION TO STRIKE EXHIBIT "Q" TO DEFENDANTS' REPLY, AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**ORDER (1) GRANTING PLAINTIFFS' EX PARTE MOTION TO STRIKE EXHIBIT "Q" TO DEFENDANTS' REPLY, AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On November 16, 2007, Defendants Hawaiʻi Pacific Health ("HPH"),

Kapiʻolani Medical Center for Women and Children ("KMCWC"), and Kapiʻolani

Medical Specialists ("KMS") (collectively "Defendants") filed a motion for

summary judgment on the claims brought by Kelley A. Woodruff, M.D. and Robert Wilkinson, M.D. (collectively "Plaintiffs").  Plaintiffs' *qui tam* action, brought under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the Hawaii False Claims Act, Hawaii Revised Statutes ("HRS") § 661-21, *et seq.*, alleges that Defendants submitted false claims to Medicaid.  Defendants move for summary judgment on all claims in Plaintiffs' Second Amended Complaint ("Complaint"), including claims that Defendants submitted facially false UB-92 forms for procedures performed by unsupervised nurse practitioners, conspired to submit false claims, and that Defendants terminated Plaintiffs in retaliation for speaking out about the allegedly false claims.  Because the court concludes that Defendants did not submit facially false claims, and Plaintiffs' retaliation claim is barred by the statute of limitations, the court GRANTS Defendants' Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

### A. **Factual Background**

#### 1. *Hem-Onc Claims*

Plaintiffs are former employees of Defendants; Dr. Woodruff worked in pediatric hematology-oncology ("Hem-Onc"), and Dr. Wilkinson was the chief of the Hem-Onc Department.  Plaintiffs allege that Defendants billed Medicaid

agencies for Hem-Onc procedures performed by Diane Fochtman, an unlicensed nurse practitioner, who was not supervised by a physician. The four Hem-Onc procedures at issue include: lumbar puncture, bone marrow aspiration, bone marrow biopsy, and chemotherapy into the central nervous system. *See* Woodruff Decl. ¶ 11, attached to Plaintiffs' Separate Concise Statement of Facts ("SCSF"). According to Plaintiffs, these included both inpatient and outpatient procedures. Pls.' Opp'n 7.

In March 1999, Defendants instituted an internal billing policy regarding Hem-Onc procedures. Under the policy, patient charts were required to contain evidence that a physician, as opposed to a nurse practitioner, performed the procedure in order for a claim for the physician's professional services to be submitted to a third-party payor. As discussed more fully below, professional fees for physicians are billed on HCFA form 1500, while fees for other hospital and technical charges are submitted on the UB-92 form.

The billing policy caused concern among some Hem-Onc physicians. According to Wilkinson, he was concerned "because it appeared to patients that when Nurse Fochtman performed the procedure, they were not being billed for the professional component of the service and this was inducing patients to request that Nurse Fochtman perform the bone marrow and spinal tap procedures instead

of the hem-onc staff physicians." Wilkinson Decl. ¶ 11. According to Wilkinson, the billing policy resulted in discounts to some patients and not others. *Id.* Wilkinson submitted a complaint about this practice to Defendants' fraud hotline on February 11, 2001. *Id.*; Defs.' Ex. G at A-0027.

According to Defendants, several Hem-Onc physicians adopted their own interpretations of the internal billing policy, while Wilkinson told physicians in the department that sufficient participation includes "throwing on a glove and touch[ing] the patient or the needle." *Id.* at A-0022. Wilkinson performed all of his own procedures and did not submit claims for services rendered in whole or in part by nurse practitioners. *Id.* at A-0023. Woodruff, who billed for professional services if she "participated" in some capacity in procedures performed by Fochtman, *id.* at A-0024, said that she could bill if she "just ran in and touched the patient," *id.*, or if she "merely labeled the resulting specimen or checked medication." *Id.* at A-0016.

During 2001, Defendants engaged Deloitte & Touche to perform an audit of patient files as part of an internal assessment of billing compliance across departments. At Deloitte & Touche's request, Defendants engaged attorney Dennis Warren to head this review. According to Defendants, it appeared that in a number of instances, nurse Fochtman had performed the Hem-Onc procedures. *Id.*

4

at A-0013.  Further, a newer physician claimed that Fochtman was performing the majority of the procedures in the Hem-Onc Department.  Defendants launched an investigation into whether third-party payors were being billed for professional services for procedures performed by Fochtman or other nurse practitioners.[1] Fochtman kept a log of all procedures she performed, which was part of the investigation.  *See* Pls.' Ex. S1.  The investigation concluded that out of 101 procedures Fochtman performed during 2000 and 2001, 85 were billed for professional fees under Woodruff's name.  Defs.' Ex. G at A-0026.  As a result of the investigation, Defendants submitted a September 4, 2001 Voluntary Disclosure to the Office of the Inspector General of the United States Department of Health and Human Services.[2]  *See generally* Defs.' Ex. G.

Defendants disclosed to the government that third-party payors had been billed for professional services for procedures performed by nurse practitioners, who were not properly licensed.[3]  The Voluntary Disclosure also

---

[1] Plaintiffs claim that Defendants began their investigation after they submitted compliance complaints in February 2001, and Woodruff undertook her own investigation into billing practices of Neo-natal Intensive Care Unit ("NICU") nurses.  *See* Pls.' Opp'n 4.

[2] As part of a settlement of unrelated compliance issues, Defendants entered into a Corporate Integrity Agreement ("CIA") with the government in August 1999.  Defendants made their Voluntary Disclosure pursuant to the CIA.  *See* Defs.' Ex. G.

[3] *See* discussion of nurse licensing *infra* Section IV(A)(3).

states that corrective actions were taken to remedy the billing concerns.  Based on the findings, Defendants refunded the third-party payors all professional fees paid for the four Hem-Onc procedures from February 1997 through July 31, 2001.  *Id.* at A-0010.  Later, Defendants refunded the hospital or technical charges associated with the procedures performed by the nurse practitioners during this same time period.  *See* Defs.' Ex. I.

Defendants concluded that Woodruff adopted her own interpretation of the internal billing policy that was "apparently designed to avoid compliance with it," Defs.' Ex. G at A-0016, and Wilkinson "made no attempt to have his personal interpretation of the policy, or that of the other Hem-Onc physicians, approved" by Defendants.  *Id.* at A-0015.  Plaintiffs were told that they could resign or would be terminated for their role in circumventing the internal billing policy.  *Id.* at A-0030.  Wilkinson resigned effective December 31, 2001. Wilkinson Decl. ¶¶ 8-10.  Woodruff refused to resign and was terminated in January 2002.  Woodruff Decl. ¶¶ 50-51, attached to Pls.' SCSF.  The September 4, 2001 Voluntary Disclosure relates that during employee disciplinary interviews, "both Wilkinson and Woodruff characterized themselves as 'whistleblowers' who are now being retaliated against by [Defendants]."  Defs.' Ex. G at A-0027.

### 2.      NICU Claims

In addition to claims for the Hem-Onc procedures, Plaintiffs allege

that Defendants falsely billed for procedures performed by nurse practitioners in

the Neo-natal Intensive Care Unit ("NICU").  According to Plaintiffs, Defendants

submitted UB-92 forms for payment of hospital charges for procedures performed

unsupervised by nurse practitioners Michelle Zippay and Randy Taniguchi.

Plaintiffs claim that these procedures, including "[c]ircumcisions, endotracheal

intubations, umbilical arterial catheterization, chest tube placement, and lumbar

punctures, performed on high risk newborns are considered physician-only

procedures."  Wilkinson Decl. ¶ 27.  All of the NICU procedures at issue are

inpatient procedures.

### 3.      Billing Background

Plaintiffs claim that Defendants submitted facially false UB-92 forms

to Medicaid for payment of hospital charges related to the Hem-Onc and NICU

procedures.  UB-92 forms, also known as HCFA 1450 forms, are used by hospitals

to request reimbursement for technical charges, including room and board,

equipment costs, nursing costs, laboratory costs, and medical supplies; they are not

used to bill for the physician's professional component of services provided.

Defs.' Ex. A ¶¶ 4, 7.  Professional services are billed separately, by the physician,

7

using an HCFA 1500 form.  *Id.* ¶ 4.

The UB-92 form contains several fields for inputting required information.  The fields (sometimes referred to as "form locators") at issue in this case include field 82 ("Attending Phys. ID"), field 83 ("Other Phys. ID"), and field 44 ("HCPCS/Rates").  *See* Defs.' Ex. B.  Various coding systems are used to complete UB-92 fields, including the Healthcare Common Procedure Coding System ("HCPCS") and Common Procedural Terminology ("CPT").  Defs.' Ex. A ¶ 8; Pls.' Ex 15.  CPT codes established by the American Medical Association are generally numeric five digit codes, and are defined by doctors for doctors.  Defs.' Ex. A ¶ 8; *see also* Woodruff Decl. ¶ 56 (CPT "is a systematic listing and coding of procedures and services performed by physicians.").[4]

According to Defendants, the hospital and physician can each bill the same HCPCS code on their respective UB-92 and HCFA 1500 claim forms, but the same code may convey different information to the payor.  Defs.' Ex. A ¶ 10. While the hospital is billing for the costs of providing the service including equipment, nursing, and overhead, the physicians are billing for their time and

---

[4] According to Defendants' expert Debbie Hiraoka, "CPT codes have been incorporated to HCPCS as the first level of HCPCS codes.  HCPCS level II codes are established by Centers for Medicare and Medicaid Services (CMS) and are alpha numeric codes used for items such as supplies, durable medical equipment and drugs."  Defs.' Ex. A ¶ 9.

professional services; the ancillary costs are billed only by the hospital.  *Id.*

Inpatient and outpatient services are paid differently and must be billed differently.  *Id.* ¶ 11.  Inpatient services are billed only by revenue code in field 42, and HCPCS codes do not appear on these claims.  *Id.* ¶ 12.  Medicaid generally pays a per diem rate for inpatient claims.  *Id.*  On the other hand, for outpatient services, providers bill by revenue code in field 42 and HCPCS code in field 44.  *Id.* ¶ 13.  According to Defendants, outpatient claims are generally paid based on the HCPCS code billed, and the HCPCS code describes the services being billed.  *Id.*

With respect to field 82 (labeled "Attending Phys. ID"), Hawaii's UB-92 Provider Manual ("Provider Manual")[5] defines "Attending Physician ID" as:

> The name and/or number of the licensed physician who would normally be expected to certify and recertify the medical necessity of the services rendered and/or who has primary responsibility for the patient's medical care and treatment.

Defs.' Ex. D at 82-1.

As to Field 83 (labeled "Other Phys. ID"), the Provider Manual defines "Other Physician ID" as:

---

[5] The Provider Manual sets forth billing instructions for each UB-92 field.  Both parties agree that the Provider Manual effective May 1, 1996 applies to this case.

> The name and/or number of the licensed physician other than
> the attending physician as defined by the payer organization.

*Id.* at 83-1.  Specific to Medicaid, the Provider Manual further provides for field

83:

> If inpatient surgery was performed, enter the Medicaid Provider
> Number of the physician who performed the primary surgical
> procedure.  If no surgical procedure was performed, enter the
> Medicaid Provider Number of the physician to whom the
> patient was referred for follow-up or additional services, if any.

*Id.*  The parties agree that this entire provision applies solely to inpatient billing.

Plaintiffs allege that Defendants submitted false UB-92s, and cost

reports based on the UB-92s, because Defendants reported physicians' names in

fields 82 and 83 when nurse practitioners performed the Hem-Onc and NICU

procedures.  According to Plaintiffs, these claims were facially false because the

physicians did not personally perform the procedures.  They also claim that certain

procedures are "physician-only" based on the HCPCS code listed in field 44.

Thus, according to Plaintiffs, because a physician's name was listed in fields 82

and/or 83, and because the HCPCS codes describe physician-only codes,

Defendants fraudulently billed Medicaid for hospital charges when nurse

practitioners performed the Hem-Onc and NICU procedures.

#### *4.* *Nurse Practitioners*

Plaintiffs also claim that the nurse practitioners were "unlicensed." The three nurse practitioners who performed procedures at issue in this case -- Fochtman, Zippay, and Taniguchi -- were not recognized as advanced practice registered nurses ("APRN") by the State of Hawaii before 2001. With respect to Fochtman, Defendants stated in their 2001 Voluntary Disclosure Statement that she "was acting, during all or part of the time period covered by this Disclosure, as a nurse practitioner when, in fact, she was licensed *only* as a registered nurse." Defs.' Ex. G at A-0018. Dennis Warren also stated in a deposition that Fochtman did not have a "nurse practitioner's license." Pls.' Ex. 27 at 121. Fochtman has been licensed as a registered nurse by the Hawaii Board of Nursing since 1992, Defs.' Ex. O ¶ 6; she received her Masters of Nursing Degree in pediatric nursing, *id.* ¶ 1; and is certified as a Pediatric Nurse Practitioner by the National Certification Board of Pediatric Nurse Practitioners and Nurses. *Id.* ¶ 4; Defs.' Ex. U.

During the relevant time period, Zippay was licensed as a registered nurse in Hawaii, Defs.' Ex. R ¶ 1; graduated from a neonatal nurse practitioner program in 1989, *id.* ¶ 2; and obtained certification as a neonatal nurse practitioner from the National Certification Corporation for the Obstetric, Gynecologic, and Neonatal Nursing Specialties in 1990. *Id.* ¶ 2; Defs.' Ex. V. Taniguchi has been

11

licensed as a registered nurse in Hawaii since 1994, Defs.' Ex. S ¶ 4; he received

his Masters of Nursing degree in a neonatal nurse practitioner program in 1994, *id.*

¶ 1; and has been certified since 1995 by the National Certification Corporation

for the Obstetric, Gynecologic, and Neonatal Nursing Specialties as a neonatal

nurse practitioner.  *Id.* ¶ 3; Defs.' Ex. W.  Defendants claim that these nurses meet

the requirements of nurse practitioners in Hawaii, and were qualified to perform

the Hem-Onc and NICU procedures at issue in this case.

**B.     Procedural Background**

The court previously ruled on three motions to dismiss filed by

Defendants.  On October 3, 2006, the court dismissed Plaintiffs' original August

15, 2005 Complaint.  On October 16, 2006, Plaintiffs filed a First Amended

Complaint, which the court dismissed by Order dated February 5, 2006.  Plaintiffs

filed their Second Amended Complaint on January 30, 2007.  In a May 21, 2007

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the

Second Amended Complaint, the court held that Plaintiffs stated a cause of action

under the FCA based on facially false UB-92s:

> The Second Amended Complaint states that "Med-QUEST
> requires providers to identify the licensed attending physician
> in field 82 of the UB-92 claim, and to identify in field 83 any
> other licensed physician or other licensed professional who
> performed a procedure on which the claim for provider services

is based." 2d Am. Compl. ¶ 26.e.  Defendants allegedly used
codes indicating that the services were performed by a
physician or licensed professional, when they were not.  *See*
2d. Am. Compl. ¶¶ 63, 68, 72.  Further, "Defendants withheld
the material fact that the procedures . . . were performed by
unlicensed personnel each time it submitted a periodic cost
report which included the costs claimed on the UB-92[.]"  2d.
Am. Compl. ¶ 26.e.i.a.  Plaintiffs sufficiently state a claim that
Defendants made claims for payment that were literally false or
fraudulent.

May 21, 2007 Order at 12.

Defendants filed their Motion for Summary Judgment on November

16, 2007, seeking summary judgment on the grounds that: (1) the UB-92s are not

facially false; (2) Plaintiffs fail to show an intent to defraud Medicaid;

(3) Plaintiffs fail to sufficiently allege a conspiracy under the FCA; (4) the statute

of limitations precludes recovery for claims submitted more than six years prior to

the filing of the Complaint; and (5) Plaintiffs' retaliation claim is barred by the

applicable statute of limitations.

Plaintiffs filed their Opposition on February 28, 2008 and Defendants

filed their Reply on March 6, 2008.[6]  On March 14, 2008, Plaintiffs filed an Ex

---

[6] In their Opposition, Plaintiffs ask the court to strike Defendants' expert declarations
because they failed to employ the rigor expected of an expert in the field.  Because the parties
have not thoroughly briefed the Rule 702 issue as part of their summary judgment arguments, the
court declines to resolve the expert admissibility issues on the record before it.  *See Cortes-*
*Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("We conclude,
therefore, that at the junction where *Daubert* intersects with summary judgment practice,

(continued...)

Parte Motion for Leave to File Surreply, or Strike Defendants' Reply, or for Rule

56(f) Continuance.  At the March 17, 2008 hearing on the Motion for Summary

Judgment, the court granted Plaintiffs' motion to the extent it sought leave to file a

Surreply, but denied the motion in all other respects.  Defendants filed a Response

to Plaintiffs' Surreply on March 21, 2008.  On March 14, 2008, Plaintiffs also

filed an Ex Parte Motion to Strike Exhibit "Q" to Defendants' Reply.  Defendants

filed an Opposition to the motion on March 21, 2008.

## III.  <u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment as to any claim where there

is no genuine issue as to any material fact contained in the pleadings, depositions,

answers to interrogatories, admissions or affidavits.  Fed. R. Civ. P. 56(c).  "One

of the principal purposes of the summary judgment rule is to isolate and dispose of

factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[6](...continued)

*Daubert* is accessible, but courts must be cautious -- except when defects are obvious on the face of a proffer -- not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 739 (3d Cir. 1994) ("Given the 'liberal thrust' of the federal rules it is particularly important that the side trying to defend the admissibility of evidence be given an adequate chance to do so." (internal citation omitted)).  Given the limited evidence and argument presented, at this time the court sees no basis to exclude the expert testimony.  Further, the court relies only on the Hiraoka Declaration, not the Sueyoshi Declaration.  With respect to the Hiraoka Declaration, the court does not rely on any of Hiraoka's conclusions in reaching its ultimate decisions, but rather, cites the Hiraoka Declaration only for general background on billing procedures and coding systems.

323-24 (1986).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  The moving party bears the initial burden of showing that there is no factual dispute regarding those claims for which summary judgment is sought.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  <u>ANALYSIS</u>

### A.    Defendants' Exhibit Q

Plaintiffs ask the court to strike Defendants' Exhibit Q, Kathleen Yokouchi's declaration, because Yokouichi was not identified as an expert witness pursuant to Federal Rule of Civil Procedure 26(a)(2).  Defendants argue that Yokouchi's declaration constitutes lay opinion testimony because it is based on her personal knowledge.  In the alternative, Defendants claim that Plaintiffs are not prejudiced by her late designation as an expert.

15

Yokouchi is the Executive Officer of the Hawaii Board of Nursing, and states in her declaration that she is familiar with the rules governing the licensing and regulation of nursing.  Specifically, she is "familiar with the changes in laws in 1994 implementing the recognition of an Advanced Practice Registered Nurse (APRN) pursuant to HRS § 457-8.5, and prescriptive authority for APRNs pursuant to HRS § 457-8.6."  Defs.' Ex. Q ¶ 2.  She also interprets statutes regulating nursing, explaining that under HRS § 457-2, "the definition of 'the practice of nursing as a registered nurse' means that a RN can practice to the full extent of the nurses' formal education and demonstrated competency, including training obtained through a Board-recognized nursing program and certifications from Board-recognized national certifying bodies which the RN has received."  *Id.* ¶ 4.

The court concludes that Yokouchi's interpretation of nursing regulations based on her specialized knowledge provides expert testimony pursuant to Federal Rule of Evidence 702 and is not lay opinion.  The court also rejects Defendants' contention that Plaintiffs have not been prejudiced by their non-disclosure.  Defendants attached Exhibit Q to their Reply -- not to their Motion for Summary Judgment -- and Plaintiffs did not have the opportunity to conduct discovery regarding Yokouchi's opinion or submit their own expert

16

testimony on the matter.  The court STRIKES Defendants' Exhibit Q.

**B.      Facially False Claims Under the FCA**

*1.      Statutory Framework*

Plaintiffs allege violations of the federal and state false claims acts.[7]

Under the relevant FCA provisions:

> Any person who--
>> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>> . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

31 U.S.C. § 3729(a).

"The essential elements of FCA liability [are]: (1) a false statement or

fraudulent course of conduct, (2) made with scienter, (3) that was material, causing

---

[7] The Hawaii False Claims Act, HRS § 661-21, is nearly identical to the federal FCA; thus, the court applies the same analysis for liability under the federal and state FCA.  *See United States ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1072 (D. Haw. 2007).

(4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) ("To establish a cause of action under the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1), the government must prove three elements: (1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false.").[8]

---

[8] *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006), a case based on the false-certification and promissory fraud theories of FCA-liability, includes a "materiality" requirement. Although the remaining claims in the instant case are not based on false-certification or promissory fraud liability, in FCA cases generally, several courts have treated materiality as an additional, judicially created requirement. *See United States ex rel. A+ Homecare Inc. v. Medshares Mgmt. Group Inc.*, 400 F.3d 428, 443 (6th Cir. 2005) (concluding that "the FCA imposes liability only for false statements or conduct which are material to a false or fraudulent claim for money or property from the Government"); *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 886-87 (8th Cir. 2003) (noting that Eighth Circuit precedent implies a materiality standard stricter than mere relevancy); *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 675 (5th Cir. 2002) ("Although the statute contains no express reference to materiality, many courts, including this court, have found that there is a fourth, 'materiality' element required to maintain a cause of action under the Act."); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("Liability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material. Materiality depends on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." (citation, quotation signals, and internal footnote omitted)); *United States ex rel. Oliver v. The Parsons Corp.*, 498 F. Supp. 2d 1260, 1288-89 (C.D. Cal. 2006) ("Although not yet determined by the Ninth Circuit, each Court of Appeals reaching the issue has, in addition to the FCA's explicit requirements, inferred a requirement that the false statement or claim be material. Accordingly, this Court finds that materiality is a required element of Plaintiff's claims under the FCA." (citation, quotation signals, and internal footnote omitted)).

*Oliver* concluded that the "natural tendency" test is the appropriate standard for materiality in the context of the FCA. *Oliver*, 498 F. Supp. 2d at 1289. The "natural tendency" test "is based on the general materiality standard laid out by the United States Supreme Court:

(continued...)

To maintain a claim for conspiracy under 31 U.S.C. § 3729(a)(3), a plaintiff must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation and quotation signals omitted).

## 2.   *The UB-92s Are Not Facially False*

Plaintiffs argue that the claims submitted for the four Hem-Onc procedures and various NICU procedures are facially false because the UB-92s do not indicate that they were performed by unsupervised nurse practitioners without proper licensing or credentialing.  The court first addresses whether the nurses were properly licensed, whether the procedures are "physician only," and then examines whether UB-92s that contained physician names in fields 82 and 83, and/or HCPCS codes in field 44, were facially false.

---

[8](...continued)
'[A] concealment or misrepresentation is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* (*quoting Kungys v. United States*, 485 U.S. 759, 770 (1988)) (alterations in original).  "Under the FCA, a plaintiff bears the burden of establishing the element of 'materiality.'" *Id.* at 1290.

###### a.     Nurse practitioners were properly licensed

Plaintiffs allege that "Defendants omitted the material fact that Defendants were submitting claims for unsupervised procedures which they have failed to show were within the lawful scope of practice of nurses or even APRNs to perform unsupervised, and that they used the physicians' names on those claims which implied that the physicians performed the procedures." Pls.' Surreply 4. Although Defendants' attorney Dennis M. Warren stated in the 2001 Voluntary Disclosure that Fochtman "was acting . . . as a nurse practitioner when, in fact, she was licensed *only* as a registered nurse," Defs.' Ex. G at A-0018, and that she did not have a "nurse practitioner's license,"[9] Pls.' Ex. 27 at 121, Defendants now provide unrebutted evidence showing that Fochtman, Zippay, and Taniguchi were properly licensed and board-certified nurse practitioners, qualified to perform the Hem-Onc and NICU procedures.

During the relevant time period, each of the nurse practitioners was licensed as a registered nurse in Hawaii. *See* Defs.' Exs. O ¶ 6, R ¶ 1, S ¶ 4. The practice of nursing as a "registered nurse" is defined by HRS § 457-2 as "the

---

[9] The Voluntary Disclosure appears to conflate APRN-status under Hawaii law with that of a nurse practitioner and uses the terms interchangeably, stating "[the internal billing policy] established that patient charts must contain evidence that a physician, not an 'advanced practice registered nurse' ('nurse practitioner'), personally performed the Procedures in question in order for a claim to be submitted to a third party payor." Defs.' Ex. D at A-0009. In any event, the court is not bound by Warren's legal conclusions regarding the status of the nurse practitioners.

performance of professional services commensurate with the educational preparation and demonstrated competency of the individual having specialized knowledge, judgment, and skill. . . ."  This definition does not specifically limit procedures that registered nurses may perform.

Plaintiffs argue that at relevant times the nurses were not licensed as APRNs under Hawaii law.  "'Advanced practice registered nurse' means a registered nurse who has met the qualifications for advanced practice registered nurse set forth in this chapter and through rules of the board, which shall include educational requirements."  HRS § 457-2.  Under HRS § 457-8.5, entitled "Advanced practice registered nurse; qualifications; recognition; endorsement; fees; eligibility":

> (a) The board shall grant *recognition* as an advanced practice registered nurse; provided the nurse has:
> (1) A current, unencumbered license as a registered nurse in this State;
> (2) An unencumbered license as a registered nurse in all other states in which the nurse has a current and active license;
> (3) An unencumbered recognition as an advanced practice registered nurse or similar designation in all other states in which the nurse has a current and active recognition as an advanced practice registered nurse;
> (4) A master's degree in nursing as specified in rules adopted by the board or a current certification for specialized and advanced nursing practice from a national certifying body recognized by the board;

21

> provided that certified nurse midwives shall maintain
> current certification from a national certifying body
> recognized by the board; and
> (5) Paid the appropriate fees.
> . . .
> (c) Only a person who has a current, unencumbered recognition
> from the board to practice as an advanced practice registered
> nurse shall use the title "Advanced Practice Registered Nurse"
> and the abbreviation "A.P.R.N.".  No other person shall assume
> the title "nurse" or in any manner imply that the person is a
> nurse except as defined in section 457-2 or as provided in
> sections 457-7 and 457-8 or use the abbreviation "A.P.R.N." or
> any other words, letter, sign, or device to indicate that the
> person using the same is an advanced practice registered nurse.
> *Nothing in this section shall preclude a registered nurse who is
> not recognized by the board as an advanced practice
> registered nurse and who is currently certified by a national
> certifying body recognized by the board from using another
> title designated by certification.*

(emphasis added).[10]  To the extent Plaintiffs allege that the nurse practitioners

were not "licensed," the court rejects this claim.  Because an APRN title is a

"recognition" granted by the board -- not a license -- the three nurse practitioners

with RN licenses were "licensed" under Hawaii law.

Neither the nurse practitioners nor Defendants held the nurse

practitioners out as APRNs, and under Hawaii law, they did not need APRN

recognition to act as a nurse practitioners in their specialties.  Nothing in HRS

---

[10] APRNs are granted prescriptive authority under Hawaii law, which is not available for
registered nurses or nurse practitioners.  *See* HRS § 457-8.6.

22

§ 457-8.5 regarding APRN recognition precludes "a registered nurse who is not recognized by the board as an advanced practice registered nurse and who is currently certified by a national certifying body recognized by the board from using another title designated by certification."  In fact, despite Warren's earlier disclosures, Defendants have shown that the nurse practitioners were certified by national certifying bodies recognized by the board.  Under Hawaii Administrative Rules ("HAR") § 16-89-77, "'[r]ecognized national certifying body' means credentialing agencies recognized by the board which include . . . the National Certification Board of Pediatric Nurse Practitioners/Nurses; [and] the National Certification Corporation for Obstetric, Gynecologic and Neonatal Nursing Specialties. . . ."  Fochtman was certified by the National Certification Board of Pediatric Nurse Practitioners and Nurses, Defs.' Ex. O ¶ 4, and Zippay and Taniguchi were certified by the National Certification Corporation for Obstetric, Gynecologic and Neonatal Nursing Specialties.  Defs.' Exs. R ¶ 6, S ¶ 3.  The court thus rejects any argument that the UB-92s were false because the nurse practitioners were not properly licensed or certified.

Further, to the extent Plaintiffs argue that the nurse practitioners were not otherwise qualified or permitted to perform the Hem-Onc and NICU procedures at issue, they have failed to address Defendants' showings that

23

(1) there is no Hawaii requirement that physicians supervise the procedures if performed by nurse practitioners, *see* Defs.'s Ex. Z;[11] and (2) the nurse practitioners were certified to perform the procedures after demonstrated competency, as approved by the physicians with whom they worked or the Department of Pediatrics.  *See* Defs.' Exs. O ¶ 8, R ¶¶ 8-9, S ¶¶ 6-7.[12]  In short, because Plaintiffs have not met their burden on summary judgment, *see Celotex*, 477 U.S. at 324, the court rejects any theory of FCA liability based on allegations that the nurse practitioners were unlicensed or unsupervised.

> b.       *"Physician-only" procedures*

Plaintiffs also claim the UB-92s were false because the Hem-Onc and NICU procedures were "physician-only" procedures that should not have been billed to payors as hospital charges if performed by nurse practitioners.  Plaintiffs' only support for this claim is found in Claudia Birkenshaw's expert report, which

---

[11] Defendants' Exhibit Z includes annual updates from *The Nurse Practitioner, The American Journal of Primary Health Care*, which indicate that from 1995 to 2002 Hawaii did not require physician supervision of nurse practitioners.

[12]  Even if Plaintiffs had met their burden on summary judgment, it does not appear that FCA liability would attach based on the internal credentialing of the nurse practitioners.  *See Lockyer*, 490 F. Supp. 2d at 1076 ("Even if Plaintiff could show that certain nurses were not adequately qualified, such an allegation by itself does not give rise to a FCA claim.  Plaintiff does not point to [any rule] that requires oncology nurses to have certain qualifications in order to bill Medicare for their services."); *see also Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) (holding that billing for medical services that do not meet the standard of care does not give rise to a FCA violation because the FCA is an inappropriate vehicle for policing quality of care).

does not support such a blanket proposition.  Rather, Birkenshaw states

"Defendants used the UB to bill for procedures/services that were expected to be

performed by a physician (*or someone licensed to do that type of procedure*) but

since the procedures were not rendered by physicians, they submitted incorrect

claims."  Pls.' Ex. A at 6 (emphasis added).  She further explains that "[s]ome

HCPCS codes that are invasive in nature are intended to be provided by a

physician *or a practitioner properly licensed under state and federal law*."  *Id.* at

9 (emphasis added).  Defendants' expert Hiraoka asserts that "HCPCS codes on an

outpatient claim identify the type of service being billed.  It does not identify who

provided the service."  Defs.' Ex. A ¶ 14.

Further, Birkenshaw does not claim that the HCPCS codes here are

"physician-only" codes; she only says that the "numeric codes identify medical

services and procedures furnished by physicians *and other health care*

*professionals*."  Pls.' Ex. A at 4 n.3 (emphasis added).  Thus, Plaintiffs' expert's

opinion simply fails to support their broad assertion that the Hem-Onc and NICU

procedures were "physician only."[13]  There is no basis for the court to find the UB-

_____

[13] Woodruff's own opinion, that certain CPT codes are physician-only codes, likewise
provides no support.  For example, she states -- without evidentiary support -- that "CPT code
85095 is a physician-only procedure," Woodruff Decl. ¶ 56; "Codes 4131, 0392, and 0331 are
physician-only procedures," *id.* ¶ 62(d); and "CPT codes 85095 and 62270 are physician-only
procedures."  *Id.* ¶ 63.  These bare assertions, however, are not supported by facts or even a

(continued...)

92s are false based on allegations that the HCPCS codes in field 44 are "physician-

only" codes.  Beyond the HCPCS codes, there is no evidence other than

Woodruff's and Birkenshaw's bare assertions that the procedures were "physician-

only" procedures.[14]

      *c.*    *Hem-Onc claims*

      The court next addresses whether Defendants submitted facially false

---

[13](...continued)
showing that Woodruff is qualified to provide such evidence.  Instead, the affidavit simply
claims these facts as true in a vacuum.  As the Ninth Circuit has often stated, "[c]onclusory
[summary judgment] affidavits that do not affirmatively show personal knowledge of specific
facts are insufficient."  *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993); *see also Shakur v.
Schriro*, 514 F.3d 878, 890 (9th Cir. 2008); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167
(9th Cir. 2005) (holding that "conclusory statements of bias do not carry the nonmoving party's
burden in opposition to a motion for summary judgment"); *Hansen v. United States*, 7 F.3d 137,
138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose
summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create
an issue of material fact.").  Even an expert opinion requires a factual basis for any opinion
offered in an affidavit.  *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007).
Woodruff's affidavit falls short, providing no factual basis for her assertions.  Likewise,
Plaintiffs' statement in their Opposition that "the HCPCS codes describe procedures commonly
accepted as physician-only," Pls.' Opp'n 23, is unsupported by any evidence.

[14] Plaintiffs' citation to Defendants' Rule 30(b)(6) representative Mavis Nikaido's
deposition is unavailing.  Her testimony does not support their assertion that NICU procedures
were "physician-only," and she does not address HCPCS codes at all.  In fact, Nikaido
specifically believed that "NNPs" (neonatal nurse practitioners) like Zippay and Taniguchi would
have been trained to perform several of the procedures at issue.  *See* Pls.' Ex. 36; Defs.' Ex. HH.
Further, Nikaido stated in her deposition that the scope of practice for the nurse practitioners is
determined by the physician overseeing them.  *See* Defs.' Ex. HH at 8 ("[Taniguchi] was
supervised and told by the neonatologists what to do."); *id.* at 9 (affirming that "it would be the
neonatologist in charge who would decide what [Zippay] was permitted to perform").  There is
no evidence that the NICU procedures were "physician only," and the court does not address
quality of care issues under the FCA.  *See Mikes*, 274 F.3d at 700 ("[T]he courts are not the best
forum to resolve medical issues concerning levels of care.  State, local or private medical
agencies, boards and societies are better suited to monitor quality of care issues.").

UB-92s for the Hem-Onc procedures based on fields 82 and 83 for both inpatient

and outpatient procedures.  For inpatient claims, which are billed by revenue code

and not HCPCS code, Defendants reported physicians' names in fields 82 and 83

in all of the inpatient UB-92s reviewed by Plaintiffs in this litigation.[15]  Pls.'

Opp'n 2.  As to outpatient claims, which are billed according to the HCPCS code

in field 44, Plaintiffs claim that Defendants reported a physician's name in field 82

on every outpatient UB-92.  Pls.' Opp'n 2.  The four Hem-Onc procedures at issue

and their accompanying HCPCS codes include: (1) lumbar puncture (62270);

(2) lumbar puncture with injection of chemotherapy into central nervous system

(96450); (3) bone marrow aspiration (85095); and (4) bone marrow biopsy

(85102).

> i.      Field 82

All of the Hem-Onc UB-92s included a physician's name in field 82.

The Provider Manual defines "Attending Physician ID" required in field 82 as:

> The name and/or number of the licensed physician who would
> normally be expected to certify and recertify the medical
> necessity of the services rendered and/or who has primary
> responsibility for the patient's medical care and treatment.

Defs.' Ex. D at 82-1.  Field 82 does not require the name of the person who

---

[15] For outpatient procedures, Defendants did not report any physician names in field 83 and there is no allegation that such claims are facially false.

performed the procedure.  Nor does it require that the attending physician have

performed the service.  Listing a physician's name in field 82 when Fochtman

performed the procedure is not a false claim based on the Provider Manual.

Plaintiffs, however, claim that listing a physician's name in field 82

falsely *implies* that a physician performed the procedure.  This argument is without

merit.  The definition of "Attending Physician" clearly does not mean that the

physician listed in field 82 performed the procedure; rather, field 82 requires the

physician who (1) would normally be expected to certify and recertify the medical

necessity of the services rendered, and/or (2) has primary responsibility for the

patient's medical care and treatment.  Under the Provider Manual's plain and

unambiguous language, listing a physician's name in field 82 cannot imply that

the physician performed the procedure.[16]  The UB-92s do not constitute false

---

[16] Plaintiffs' reliance on the testimony of AlohaCare representatives is misplaced. Plaintiffs claim that AlohaCare understood that a physician named in field 82 performed or directly supervised the Hem-Onc procedures.  Such a belief is not reasonable based on the plain language of the Provider Manual.  Further, AlohaCare's Patrick Brennan agreed at his deposition that including a physician's name in field 82 would not be misleading or false:

> Q.     Field locator 82, which is on Exhibit 4 and which indicates
>        attending physician ID, you had previously testified that it would
>        have been your assumption that Dr. Wilkinson had either
>        performed the procedures or supervised the procedures.  If you will
>        assume with me that a nurse practitioner performed the procedures
>        and was properly credentialed under Hawaii law, where on Exhibit
>        4 should that be indicated?
>
> A.     I think that they don't have a place for that since they are looking

(continued...)

claims where a physician's name is listed in field 82 and Fochtman performed the Hem-Onc procedure.

   ii.  Field 83

   Plaintiffs claim that Defendants "falsely reported a physician's name in FL83 on every claim" for inpatient Hem-Onc procedures that Fochtman performed.  Pls.' Opp'n 26.  Field 83 requires "Other Physician ID," which the Provider Manual defines as:

> The name and/or number of the licensed physician other than the attending physician as defined by the payer organization.

Defs.' Ex. D at 83-1.  This portion of the definition does not require that the physician who performed the procedure be listed in field 83.  Further, the Medicaid-specific requirements of the Provider Manual state:

> If inpatient surgery was performed, enter the Medicaid Provider Number of the physician who performed the primary surgical procedure.  If no surgical procedure was performed, enter the Medicaid Provider Number of the physician to whom the patient was referred for follow-up or additional services, if any.

---

[16](...continued)
for physician related information in 82 and 83.

Q. So under those circumstances, my hypothetical, putting a physician's name as attending physician would not be misleading or false; is that correct?

A. I think that's correct.

Defs.' Ex. CC at 85.

*Id.* With respect to the first sentence, Plaintiffs have not contested Defendants' assertion that the Hem-Onc procedures are not surgical. *See* Pls.' Opp'n 27.[17] The second sentence is therefore applicable and only requires the identification of "the physician to whom the patient was referred for follow-up or additional services, if any." Because the fact that Fochtman performed the procedure is irrelevant to field 83's "Other Physician ID" requirement, the UB-92s that listed a physician in that field for inpatient procedures performed by Fochtman are not facially false.

In sum, the court finds that the Hem-Onc UB-92s are not facially false because they listed a physician's name in fields 82 and 83.[18]

### d.    NICU Inpatient Claims

As to the NICU claims, all of which are inpatient, non-surgical procedures,[19] Plaintiffs assert that Defendants reported physicians' names in fields

---

[17] Defendants claim that the procedures are not surgical, *see* Defs.' Mem. in Supp. 20, and Plaintiffs have neither presented evidence to the contrary nor otherwise directly challenged Defendants' claim. *See* Pls.' Opp'n 27. Plaintiffs, the non-moving party, have failed to make a showing sufficient to establish a genuine issue of material fact on this issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[18] The court also finds that the Hem-Onc UB-92s are not false based on the HCPCS codes listed in field 44. As discussed above, Plaintiffs have not established that any of the HCPCS codes are "physician-only" codes. The court similarly rejects Plaintiffs' claims based on ICD-9-CM codes listed in fields 80/81; Plaintiffs' allegation that the ICD-9-CM codes listed in these fields are "substantially identical to the HCPCS code descriptions, and thus they had identical inherent meanings," Pls.' Opp'n 27, does not make the UB-92s false.

[19] Plaintiffs agree that the NICU procedures are non-surgical. *See* Pls.' Opp'n 27-28.

82 and 83 in every case.  Pls.' Opp'n 2.

Plaintiffs again claim that listing a physician's name in fields 82 and 83 falsely implies that a physician performed the NICU procedure.  As discussed above, Plaintiffs have not supported their claim that these were "physician-only" procedures.  Field 82 requires the attending physician, the definition of which does not include the person who actually performed the procedure or service.  Further, field 83 does not list the physician who performed the procedure; because the inpatient NICU procedures were non-surgical, field 83 listed "the physician to whom the patient was referred for follow-up or additional services, if any."  Defs.' Ex. D at 83-1.  For the same reasons discussed with respect to the Hem-Onc claims, the court concludes that the NICU claims do not constitute facially false UB-92s.[20]

### 3.    *The Cost Reports Are Not Facially False*

Defendants were periodically required to submit cost reports aggregating UB-92 data.  Plaintiffs allege that cost report claims "for

---

[20] To the extent Plaintiffs now attempt to reframe their theory of liability to include Defendants' alleged "omission of optional modifiers," the court rejects this theory.  The UB-92s are not rendered false simply because Defendants did not include the modifiers where *Medicare* (as opposed to Medicaid) allowed modifiers in field 44 to show that a nurse performed the procedure.  There is no evidence that modifiers were required and that failure to include them rendered the claim facially false.  On the contrary, Defendants' expert Hiraoka stated that Medicaid did not require modifiers for UB-92 billing, nor was there a specific field on the UB-92 to indicate a modifier.  Defs.' Ex. A ¶ 16.

reimbursement of any costs for inpatient or outpatient services connected with an unlicensed act were false claims."  Compl. ¶ 26(d)(v).  The UB-92s do not constitute false claims; likewise, certification and submission of cost reports based on the UB-92s do not constitute false claims.

Because the court concludes that the Hem-Onc and NICU UB-92s and related cost reports do not constitute false claims, the court does not reach Defendants' alternative grounds for summary judgment including lack of intent to defraud Medicaid, and their claim that the statute of limitations precludes recovery for bills submitted six years prior to this action.  The court GRANTS Defendants' motion with respect to the UB-92s and cost reports.

### 4.   Conspiracy

Because the court concludes that Defendants did not submit false claims based on the UB-92s, Plaintiffs' conspiracy claim fails.  Absent evidence of a false claim as alleged, Defendants did not conspire to have a false claim paid by the United States.  *See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 459 F. Supp. 2d 1081, 1091 (D. Kan. 2006); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.,*  274 F. Supp. 2d 824, 863 (S.D. Tex. 2003) ("[T]he evidence does not show that the government suffered any injury as a result of the conspiracy alleged, a necessary element to a claim under FCA

§ 3729(a)(3).”); *United States ex rel. Fent v. L-3 Commc'ns Aero Tech LLC*, 2007 WL 3283689, at *5 (N.D. Okla. Nov. 2, 2007) (holding that there can be no conspiracy "to submit a false claim if no false claim has been shown to exist"). The court GRANTS Defendants' motion as to Plaintiffs' conspiracy claims under the FCA.

## C.    Retaliation

Plaintiffs allege they were retaliated against in violation of the FCA's whistleblower provision, 31 U.S.C. § 3730(h),[21] when they were terminated or forced to resign after investigating and complaining about billing for the Hem-Onc and NICU procedures.  Plaintiffs must show three elements: (1) that they engaged in activity protected under the statute; (2) that the employer knew they engaged in protected activity; and (3) that the employer discriminated against them because they engaged in protected activity.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, ---

---

[21] Under this provision:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. . . .  An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h).

F.3d---, 2008 WL 852186, at *4 (9th Cir. Apr. 1, 2008).  A plaintiff alleging an

FCA retaliation claim must show that he or she "suspected that the defendant

submitted a false claim -- not that the defendant actually submitted one." *Id.* at *3.

Defendants move for summary judgment on the grounds that

Plaintiffs' retaliation claim is barred by the applicable statute of limitations.  In

*Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*,

545 U.S. 409 (2005), the Supreme Court examined the statute of limitations for

FCA retaliation claims under § 3730(h), and ruled that the statute of limitations

starts to run "when the cause of action (here retaliation) accrues." *Wilson,* 545

U.S. at 419.  Looking to analogous state statutes of limitations, the Court

concluded that the cause of action accrues in retaliation actions "when the

retaliation occurs." *Id.*  Footnote three of the opinion catalogues analogous state

statutes of limitations including HRS § 378-63(a), which contains a two-year

statute of limitations.  *Id.* at 419 n.3 ; *see also United States ex rel. Lockyer v.*

*Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1082 (D. Haw. 2007) ("[T]the two year

statute of limitations runs from the date of the occurrence of the alleged

violation.").

Plaintiffs allege that Defendants retaliated against them by

"demanding their resignations from their employment with Defendant KMS on

July 16, 2001." Compl. ¶ 119. The two-year statute of limitations began to run for Wilkinson by December 31, 2001 when he resigned following Defendants' demand, and when Woodruff refused to resign and was terminated on January 13, 2002.

Plaintiffs' original Complaint was filed on August 15, 2005 -- more than two years after the alleged acts of retaliation in 2001 and 2002. Plaintiffs' retaliation claim under 31 U.S.C. § 3730(h) is barred by the two-year statute of limitations.[22] Defendants' motion is GRANTED on this claim.

---

[22] The court rejects Plaintiffs' claim that the statute of limitations did not begin to run until November 7, 2003 when Plaintiffs believed they had sufficient facts to support a retaliation claim. *See* Pls.' Opp'n 38. This argument is foreclosed by the holding in *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409, 419 (2005), that the cause of action accrues "when the retaliatory action occurs." *See also Lockyer*, 490 F. Supp. 2d at 1082 ("[T]the two year statute of limitations runs from the date of the occurrence of the alleged violation.").

To the extent Plaintiffs rely on Hawaii's discovery rule, *see Buck v. Miles*, 89 Haw. 244, 251, 971 P.2d 707, 724 (1999), this claim is likewise without merit. Even under the discovery rule, Plaintiffs had sufficient information more than two years before they filed their Complaint, and their 31 U.S.C. § 3730(h) claims are not subject to the requirements of Federal Rule of Civil Procedure 9(b). *Mendiondo v. Centinela Hosp. Med. Ctr.*, ---F.3d---, 2008 WL 852186, at *4 (9th Cir. Apr. 1, 2008). Plaintiffs investigated and complained about Defendants' billing practices in 2001, and knew or should have known of the retaliation when they were forced to resign in 2001, and Woodruff was terminated in 2002. In fact, the September 4, 2001 Voluntary Disclosure relates that during employee disciplinary interviews, "both Wilkinson and Woodruff characterized themselves as 'whistleblowers' who are now being retaliated against by [Defendants]." Defs.' Ex. G at A-0027. Further, Woodruff herself filed a complaint alleging retaliatory discharge in Hawaii state court on January 11, 2002, which states that she was terminated from her "employment with KMS in retaliation for, and the termination proximately caused by, Dr. Woodruff's expressions of concern about Defendants' failure to bill for the services of the Nurse Practitioner, which was somehow related to compliance issues Defendants had not properly or effectively addressed previously." Defs.' Ex. EE ¶ 167.

# V.  <u>CONCLUSION</u>

Based on the foregoing, the court GRANTS Defendants' Motion for Summary Judgment.  There are no remaining claims in this action.  The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 2, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*U.S. ex rel. Woodruff, et al. v. Haw. Pac.Health, et al.*, Civ. No. 05-00521 JMS/LEK, Order (1) Granting Plaintiffs' Ex Parte Motion to Strike Exhibit "Q" to Defendants' Reply, and (2) Granting Defendants' Motion for Summary Judgment